WAIT *vs.* WAIT.

A divorce dissolving the marriage contract on the ground of the adultery of the husband, does not deprive the wife of her right of dower in his real estate.

At common law it seems a divorce avoided the marriage *ab initio*, and was not granted for adultery or other causes happening *after* the marriage.

A divorce or separation which recognized the validity of the marriage and avoided it for causes subsequent, was *a mensa et thoro* merely; and such was a divorce for adultery.

A divorce for adultery under the statute of New York is *prospective* in its operation, and has no other effect upon the marriage relation than such as is declared by the statute.

EJECTMENT for dower, first tried at the Saratoga circuit in [96] November, 1847, before Mr. Justice PAIGE. The plaintiff, in November, 1825, obtained from the court of chancery a decree

of divorce from her husband, Joseph Wait, for the adultery of the latter. The decree declared the marriage contract dissolved and that the parties were each of them "freed from the obligations thereof." Joseph Wait, prior to the divorce, and while the plaintiff was his wife, was seised of the premises in question. He died in 1845. The defendant was in possession at the commencement of the suit.

On this state of facts the justice at the circuit directed a verdict for the plaintiff, and the defendant having excepted to the ruling, moved for a new trial, which was granted by the supreme court, sitting in the fourth district, in September, 1848, (*See* 4 *Barb. S. C. Rep.* 192.) On another trial the defendant had a verdict, and after judgment thereon the plaintiff appealed to this court; the question upon the facts stated being whether the plaintiff was entitled to dower.

*E. F. Bullard* for the plaintiff insisted that a divorce granted under the statute of this state for the adultery of the husband, did not have the effect to deprive the injured wife of her right to dower. The decree he said had precisely the effect given to it by the statute, and no other or greater. A divorce at the common law was for causes antecedent to the marriage, and avoided it *ab initio*. A divorce or separation for adultery was at common law *a mensa et thoro* merely, and did not deprive the wife of her dower. Under our statute it expressly deprives her of dower, where she was the guilty party, leaving it to be implied that she is not deprived where she is not in fault. He cited *Lawrence* v. *Miller*, (2 *Comst.* 255;) *Church* v. *Bull*, (2 *Denio*, 431;) *Kelly* v. *Harrison*, (2 *John. Cas.* 29;) (2 *R. L.* 198, § 4; *id.* 199, § 8; 2 *R. S.* 145, § 45; *id.* 147, § 54; 1 *id.* 741, § 8; 2 *id.* 144, 145, §§ 38, 39, 40, 41, 42, 43, 44, 45.)

*N. Hill, Jr.* for respondent. I. No *right* of dower is acquired by *marriage*, but only a possibility of being endowed, depending [97] upon the contingency of the wife surviving the husband, and having a *dowable capacity at the time of his death*. The *right* to dower is *wholly acquired* by the death of the husband, and

has no existence, except as a mere *possibility*, before that time. (24 *Wend.* 197–8; 10 *Coke's Rep.* 49; *Plowd. Com.* 373; *Park on Dower*, 247.) Marriage is no further essential to the *right* of dower, than as it places the wife in such a relation to the husband that she *may become his widow*, and thus gives her a *dowable capacity*. And it may not give even that; e. g. where the husband or wife is an *alien*. (24 *Wend.* 197–8; *Crabb's Law of Real Prop.* §§ 1127–8; 16 *Wend.* 617.)

II. One of the essential elements of a *dowable capacity* is, that the claimant should be *the widow* of the alledged husband. All the provisions of law on this subject, from the very earliest period to the present, speak of *the widow* as the only person entitled to dower. (*See the references in* 4 *Barb.* 204–5, *and* 24 *Wend.* 197.) Hence the well settled rule, that the *marriage must continue until the husband's death*, and that the claimant must be *then* his actual *wife;* this being essential to constitute her *his widow*. (4 *Kent's Com.* 54; 2 *Black. Com.* 130; 24 *Wend.* 196; 2 *Edw. Ch. Rep.* 596; *Coke's Litt.* 32, *a;* 1 *Har. & Gill*, 290.)

III. The plaintiff below, having been divorced *a vinculo* in 1825, ceased to be *the wife* of Joseph Wait, and her *dowable capacity* was thereby lost. The divorce *dissolved the marriage*, and freed each party from *the obligations thereof.* From its very nature, therefore, it operated upon the *vinculum* or bond, and destroyed the conjugal relation. (2 *R. L.* 198, § 4.) How far the claim to dower is affected by a divorce, does not depend upon the *cause* of the divorce, but upon its *nature*. If it *dissolve* the marriage, the rights dependent upon that relation cease. (*Shelf. on Mar. and Div.* 476, 478; *McQueen's Prac.* 470, note 1; *id.* 484, *note m;* 4 *Kent's Com.* 54; 2 *Black. Com.* 130; 2 *Edw. Ch. Rep.* 596; *Park on Dower*, 19, 20; 1 *Pick.* 139; 5 *Barb. S. C. Rep.* 117.)

IV. No argument in favor of the plaintiff below can be derived from the eighth section of the statute, declaring that the wife, being the guilty cause of the divorce, shall not have [98] dower. (2 *R. L.* 199, § 8.) This declaration was wholly *unnecessary*, and can not restrain or qualify the effect of the fourth

section, which is entirely *unambiguous*, and therefore not open to *construction*. (4 *Kent's Com.* 52, *note a ; Smith's Com.* 627–8; *Dwarris on Stat.* 659.) The previous statutes contained no such declaration, though they provided that the divorce should not have the effect of *bastardizing the children*, which plainly shows that an absolute divorce *a vinculo* was intended. (1 *Greenl. Laws N. Y.* 428; 1 *Kent & Rad.* 93–4.) A similar provision against *bastardizing the issue* is contained in the very statute in question, which neutralizes the argument founded on the eighth section. (*R. L.* 198, § 4.)

V. The dissenting opinion in the court below proceeds upon the following positions, viz. : 1st. That a divorce for adultery, though it destroys the *obligations* of marriage, does not affect "the *rights* which accrued under it, except so far as is specified in the statute." And, 2d. That "the marriage may be deemed *so far* continued, notwithstanding the separation, as to preserve the *right* of the wife to dower," &c. (4 *Barb.* 213, 214.) Neither of these positions can be maintained as applicable to this case. Both these positions assume that *a right* of dower accrued from the *marriage;* whereas the marriage only conferred a *capacity* or *possibility* of being endowed, which was *destroyed* by the divorce. Where a marriage is *dissolved,* and each party freed from the *obligations thereof,* the rule is directly the reverse of that stated in the dissenting opinion; for no *rights* can arise from it afterwards, except such as the statute *expressly* saves or gives. There is a perfect analogy, in this respect, between a *divorce* and a *repealing statute.* (*Shelf. on Mar. and Div.* 478; 4 *Kent's Com.* 52; *note a ;* 1 *Hill,* 324–5.) The idea that the marriage is to be deemed *so far continued* as to preserve the right of dower, involves a contradiction. It assumes that the marriage may be *dissolved,* and at the same time *continued ;* and that the woman may be the *wife of two living husbands.*

VI. There is no hardship imposed upon the wife by denying [99] her the right of dower, in cases like the present. Dower is given to the wife for the sustenance of herself, and the nurture and education of her children. (*Coke's Litt.* 30 *b.*) The statute authorizes the court to make ample provision for the wife and

children, and saves all her just rights. And, judging from the precedents cited in the dissenting opinion, she is likely to get more than an equivalent for the loss of her dower. (1 *R. L.* 199, §§ 5, 6; 7 *Hill,* 207; 10 *Paige,* 20.)

VII. The wife's right to be supported by her husband during his life, notwithstanding the divorce, is as clear as her right to dower after his death; neither being in terms mentioned in the statute. By electing to renounce the marriage, however, and seek a divorce, she voluntarily relinquishes both claims, and receives as an equivalent the statute provision, with a release from a bad bargain, and liberty to make a new and better one if she can.

HARRIS, J. A widow, says our statute, shall be endowed of the third part of all the lands whereof her husband was seised of an estate of inheritance, at any time during the marriage. (1 *R. S.* 740, § 1.) Three things, marriage, seisin, and the husband's death, are requisite to consummate this right. The relation of husband and wife must have existed. This relation invests the wife with *dowable capacity.* When this relation has been created there exists a possibility that the wife may be endowed. Then there must be *seisin during coverture.* This converts the possibility of being endowed into what is called an inchoate right of dower. The right has commenced. "Dower," says Kent, "is a title inchoate, and not consummate until the death of the husband: but it is an interest which attaches on the land as soon as there is the concurrence of marriage and seisin." (4 *Kent,* 50.) It may be compared to a life estate vested in one person, to take effect only in case he survives another. The right to enjoy the estate is but a possibility. He may, and he may not survive. If he do survive, the right becomes perfect.

The interest of the wife which has thus attached by virtue of the concurrence of marriage and seisin—her inchoate [100] right of dower—may be barred or divested in various ways, as by her uniting with her husband in the execution of a conveyance; or by a sale under the foreclosure of a mortgage for the

purchase money ; or, by her conviction of adultery in a suit for divorce brought by her husband. (2 *R. S.* 146, § 48.) And the question now presented is, whether it is also barred by a decree dissolving the marriage for the adultery of the husband. The question is entirely new. The court below were divided upon it. An opinion was delivered upon each side, each opinion evincing great learning and ability.

A divorce at common law avoided the marriage *ab initio.* It was equivalent to a sentence of nullity under our statute. It placed the parties in the same relation to each other as though there had been no marriage. The issue of the marriage were bastardized. It was in reference to the law, as it then stood, that Lord Coke said, that to entitle the wife to dower it was necessary that the marriage should continue, for if that be dissolved the dower would cease. This rule, he is careful to say, is only applicable when there is a divorce *a vinculo matrimonii;* in other words, when the marriage is declared void *ab initio.* For adultery, the divorce or separation, at common law, was only *a mensa et thoro.* Of course, it did not affect the right of dower. Until our statute, there was no such thing as a divorce which recognized and admitted the validity of the marriage, and avoided it, for causes happening afterwards. Such a divorce is, alone, the creature of the statute. The principles applicable to a common law divorce can not be made applicable to a divorce which admits the validity of the marriage, and the rights and obligations resulting from it. The effect of such a divorce must be determined entirely by the provisions of the law under whose authority it is granted. The common law divorce avoided the marriage, and all rights and obligations resulting from it. The statutory divorce is limited in its operation, and only affects the rights and obligations of the parties, to the extent declared by statute. The marriage being [101] valid, the rights it conferred, and the obligations it imposed, continue, where the legislature has failed to interfere.

In determining the question before us, therefore, we are to ascertain the will of the legislature—the intent and effect of the statute under which the divorce in question was granted.

When a divorce is granted under the statute, the operation of the decree is wholly prospective. To prevent misconstruction, it is declared that the divorce shall not affect the legitimacy of the children of the marriage. · No one, however, will pretend that such a provision, though for greater caution it may have been wise to adopt it, was in fact necessary, to save the legitimacy of such children. It is true, that the decree is, that the marriage be dissolved, and that each party be freed from the obligations thereof. This dissolution and release, however, is not absolute. The wife, when the husband is the guilty party, is still entitled to her support, and the obligations of marriage still rest upon the husband, so far as to render it unlawful for him again to marry. When the wife is the guilty party, the marriage still continues in force, so far as to give the husband a title to her property, and to render it unlawful for her to marry. As a farther penalty for her offence, the legislature have declared, that when the wife is convicted of adultery, she shall not be entitled to dower in her husband's real estate. But if, upon the dissolution of the marriage under the provisions of the statute, the wife, whether she be complainant or defendant, be divested of her dowable capacity, why declare expressly this forfeiture of the right when the wife is the guilty party? If it was the intention of the legislature that, in case of a divorce under the statute, the wife should, in no event, be entitled to dower, why not make the provision general, instead of depriving the wife of dower only in case of her being convicted of adultery? *Expressio unius exclusio alterius.* I admit that the force of this argument is, to some extent, met by the fact that the legislature have, in reference to the children of the marriage, inserted in the same act an unnecessary provision : declaring that to be law which clearly would have been law without such a provision. But it is to be remembered, that the only divorce known to our law when the statute in question was [102] passed, bastardized the issue of the marriage, and it may have been apprehended by the legislature, that, in analogy to the common law divorce, the same effect might be produced unless the act should contain an express provision to the contrary. I

am unable, however, to assign any such reason, or indeed any reason whatever, for the legislative declaration, that the wife, when the guilty party, shall forfeit her dower, if it was the intention of the legislature that in no case of divorce the right of dower should remain. It is worthy of remark, too, that though the act allowing divorces in cases of adultery was passed in 1787, the provision which forfeits the wife's dower in case of her conviction of adultery was only inserted in the revision of 1813. It seems to have been designed as an additional penalty to those already existing.

There is another provision of the revised statutes which deserves to be noticed in this connection. The revisers, when reporting the title relating to "estates in dower," (1 *R. S.* 740,) inserted a section, declaring that if a wife commit adultery, and the fact be established against her, either by a decree dissolving the marriage contract, *or by proof in any action brought by her* to recover her dower, she shall be barred, &c. Instead of adopting the section thus reported, the legislature enacted the present 8th section of the title, which declares that "in case of divorce dissolving the marriage contract for *the misconduct of the wife*, she shall not be endowed;" and that, when they came to act upon the article relating to divorces, dissolving the marriage contract, they inserted the further provision, already noticed, that a wife, being a defendant in a suit for a divorce brought by her husband, and convicted of adultery, shall not be entitled to dower. (2 *R. S.* 146, § 48.) Chancellor Kent has well remarked that it is difficult to know what, exactly, the legislature meant by the term "*misconduct of the wife;*" but, whatever effect is to be given to that term, and whether or not it was intended to embrace any other offence than that of adultery, it seems to me very clear that the legislature understood and intended that, in case of "a divorce, dissolving the marriage contract," for any other cause *than the misconduct of the* [103] *wife,* she would be entitled to dower. Else why provide so carefully, and repeat the provision, that in case of her *misconduct* she should not be endowed?

It is said that the legislature have provided for making com-

pensation to the wife for her loss of dowry, when she is the innocent party, by authorizing the court to decree an allowance for her support. But, if this provision had been intended as a substitute for the right of dower, I cannot but think it would have been so declared, as indeed it has been in some other states. The legislature seem not to have intended to leave anything to implication. It has distinctly declared what shall, and what shall not be the effect of the dissolution of the marriage. And besides, whether or not the provision which the court has the power to decree in favor of the wife can be a compensation for her loss of dower, is by no means certain. Suppose, as it sometimes happens, that when the marriage took place the husband was seised of a large real estate, and that, in the course of profligacy, which often accompanies nuptial infidelity, he has sold and squandered it, how can the wife be compensated for her right of dower in such estate? Or suppose, even, that at the time of making the decree the husband is still the owner of the real estate; the only power of the court is to sequester personal estate, and *the rents and profits* of real estate. Upon the husband's death, the real estate would pass to his heir or devisee, free from any charge in favor of the wife, unless she is entitled to her dower. If it had been the design of the legislature to substitute the allowance which the court is authorized to make, for the wife's right of dower, is it not likely that some provision would have been made for securing the payment of that allowance, out of his real estate, after his death, as well as before?

I am aware that the argument against the continuance of the wife's right of dower after a divorce for the husband's adultery, derives some support from an expression of Chancellor Kent. (4 *Kent's Com.* 54.) He says, "In case of a divorce for the adultery of the husband, it is provided in the statute law of those states which authorize the divorce, that a right of dower shall be preserved, or a reasonable provision be made for the wife out of the husband's estate, by way of indemnity for [104] the loss of her dower, and of her husband's protection." In respect to some of the states, the remark is undoubtedly true.

Thus in Massachusetts, the wife, upon a divorce being granted on account of the husband's adultery, becomes immediately entitled to her dower, in the same manner as if the husband were *naturally* dead. So, in Vermont, the court is authorized to grant an allowance to the wife *in lieu* of dower. But, in this state, we have seen that the statute has not, in terms, either preserved the right of dower to the wife, or authorized a reasonable provision to be made for her by way of indemnity for her loss of dower. Whether the one or the other was intended is left to implication and judicial construction. That the attention of the legislature was drawn to the point is quite apparent from the provisions which the statute does contain on the subject. That it was not the intention of the legislature to deprive the wife of dower when the husband is the offending party, seems to me equally clear, from the fact that care has been taken to provide that, when she is the guilty party, that right shall be forfeited. The history of the legislation on this subject, to which I have already referred, also tends to confirm this construction.

I agree with the learned judge who delivered the prevailing opinion in the court below, that a divorce for adultery under our statute resembles the parliamentary divorce in England. Nor does it differ essentially, at least in its effect, from the divorce *a mensa et thoro*, for adultery, granted by the spiritual courts. From the time of the *Reformation*, marriage ceased to be regarded as a sacrament, and, of course, was no longer held to be indissoluble. It is true that the ecclesiastical courts did not, in form, give sentences of express dissolution for causes happening after the marriage. "They seem rather," says McQueen, "to have adhered to their ancient form of judgment. They only divorced *a mensa et thoro*. But, in whatever shape their decrees were pronounced, the community, in cases of adultery, relied upon them as justifying a second act of matrimony." (*McQueen's Husb. and Wife*, 200.) The case of the Marquis of Northampton, which occurred in 1548, is referred [105] to by that writer, in support of his position. In that case it was held by a commission of delegates, at the head of whom

was Archbishop Cranmer, that a sentence of divorce for adultery, though purporting to be only *a mensa et thoro*, enabled the injured husband to marry again, living his guilty wife. Salkeld, too, says that " in the beginning of the reign of Queen Elizabeth, the opinion of the church of England was, that after a divorce for adultery, the parties might marry again. But, in Foljambe's case, in the 44th year of Elizabeth, in the star chamber, that opinion was changed." (3 *Salk.* 138, *note.*) In respect to Foljambe's case, McQueen says, "the decision appears to have all the characteristics of an arbitrary exercise of power by a tribunal, which, in fact, had no legal jurisdiction over the subject matter : a tribunal, too, which for its tyrannical excesses, was, in a few years afterwards, swept away by an indignant parliament." But the decision in the court of star chamber was never assented to by the ecclesiastical courts. The next year after this decision was made, the chamber of convocation, which seems to have been a kind of ecclesiastical parliament, enacted a canon which clearly shows that it still continued to be the opinion of the church of England, that upon a divorce for adultery, even though only *a mensa et thoro*, the parties might marry again. That canon remains, to this day, a part of the ecclesiastical law of that country. It is as follows : " In all sentences pronounced only for divorce and separation *a thoro et mensa*, there shall be a caution and restraint inserted in the said sentence, that the parties so separated shall live chastely, and neither shall they, during each other's life, contract matrimony with other person. And, for the better observance of this last clause, the said sentence of divorce shall not be pronounced until the party requiring the same shall have given good and sufficient caution and security unto the court, that they will not any way break or transgress the said restraint or prohibition." In 1604, which was the year following the second enactment of this canon, the statute of bigamy was passed, which contained an express proviso that it should not extend to any person divorced by the ecclesiastical courts. Thus it appears that the legislature did not intend to make that a felony which had often been sanctioned by competent [106]

authorities.  Under this canon the courts continued to grant divorces through the whole of the 17th century, and indeed to the present day, exacting in every case from the suitor a bond not to marry again, as a condition precedent to granting the decree sought.

About the beginning of the last century, several instances occurred in which some of the nobility, unfortunate in their domestic relations, and having failed in obtaining the relief they sought from the ecclesiastical tribunals, prevailed upon parliament to grant them a divorce.  This occasional interference of parliament gave rise to the opinion, which gradually sprung up, that nothing short of the British parliament could dissolve an English marriage.  Thus, says McQueen, " the practice of parliament supersedes the law, in particular instances, by passing special enactments in favor of those who make out a case strong enough for its interference, and who are rich enough to pay the price by which alone that interference can be purchased.  The poor, nay, even the moderately opulent, are excluded from the benefit of this truly *aristocratic indulgence.*"  According to Shelford, the usual expense of obtaining a parliamentary divorce is from three to four thousand dollars.  Submission to such a state of things for a century and a half is, it must be admitted, a most conspicuous proof of the patient qualities which are said to distinguish the English nation.

I have thus referred, historically, to the English practice for the last 300 years, for the purpose of showing that in all the forms in which divorces for adultery have been granted during all that period, with the exception of such restraint as may have been imposed by the bond exacted under the canon of 1603, the parties have been at liberty to marry again; and yet it has never been held, or even asserted, that the wife of a divorced husband is not entitled at his death, to her dower in his estate.  In respect to the parliamentary practice, which, it is agreed, is similar to that under our own statute, McQueen says, " for any thing appearing in the act to the contrary, the wife may still, notwithstanding the divorce, claim dower out of

Wait *v.* Wait.

her divorced husband's estate at his death." (*McQueen on* [107] *Husband and Wife*, 215.) Practically, the marriage was as effectually dissolved, and the parties as completely freed from its obligations, under an English divorce, whether granted by an ecclesiastical sentence or a parliamentary act, as by a divorce granted under our statute. Under the English practice, I can see nothing which should prevent the wife, though, after obtaining a divorce for the adultery of her husband, she might have become the wife of another, from obtaining at the death of her divorced husband, her dower in the estate of which he was seised during her coverture with him. This I understand to be the doctrine taught by Lord Coke, though he says nothing of the second marriage. There would be no injustice in it. On the contrary, justice requires that the innocent and injured wife should not be deprived of this right. To withhold it, would be to violate one of the first principles of justice. It is well remarked by Mr. Justice Willard in his dissenting opinion in the court below, that " it is contrary to the analogy of the law to permit the crime of one party to work a forfeiture of the rights of another." We have already seen that there is nothing in the statute which conferred the authority, under which the plaintiff was divorced from her husband, which requires that a construction should be given to it, involving such an anomaly ; but, on the contrary, there is reason to infer, from the fact that the legislature have deprived the wife of her dower when she is the guilty party, that they did not design to deprive her of it when the innocent party. But it is argued, and not without some show of plausibility, that it is only *the widow* that can be endowed, and she can only be endowed in the estate of her deeased *husband.*

Whether or not a woman, divorced from her husband, upon his subsequent death, is to be called his widow, may furnish a curious question in philology, but can not, I think, be decisive of the plaintiff's rights. It is true, the legislature, in declaring what estates are liable to dower, speak of the party entitled to dower, as *a widow.* Possibly the term may not, in every instance, be the most appropriate, yet, as descriptive of the person

[108] intended, it is clearly sufficiently so. All that the legislature meant is, that when a woman is entitled to dower, she shall be endowed of a third part of all the lands whereof her husband was seised at any time during the marriage. So of the term *marriage* used in the same section; strictly, it means nothing more than the act of uniting a man and a woman for life, yet here the legislature have used it to describe the whole period of *coverture*. All, then, that the legislature have said amounts to this : that dower is predicable only of an estate of inheritance of which the husband was seised during coverture.

The most unexceptionable definition of dower, with which I have met, is given by Roper. It is as follows : " By the intermarriage the wife becomes entitled to an estate for life, upon surviving her husband, in a third part of all such estates of inheritance of which he was solely seised during the coverture, and to which any issue she might have had might by possibility have been heir." (1 *Roper's Husband and Wife*, 331.) According to this definition, the wife at the marriage, when she becomes a wife, acquires the right to be endowed. If, at that time, the husband is seised of an estate of inheritance in lands, her right attaches to those lands at once. If, afterwards, and during the coverture, other lands are acquired, her right also attaches to these. Kent, too, as we have seen, regards dower as an *interest* which *attaches* on the land as soon as there is the concurrence of marriage and seisin. When this happens I can not see why her right to have her dower in case she survives her husband, is not as perfect as it is after his death. It is contingent, it is true, and becomes absolute, only by her survivorship. But still it is a vested right, of which she can only be deprived by her own act or by forfeiture. To construe her application for a divorce into a voluntary release or a forfeiture of her right would be contrary to every principle of legal construction. A party can not be deprived of a vested right, even though it be contingent, by mere implication. When the wife is herself the guilty party, the law declares that her conviction shall involve a forfeiture of her dower. But it has no where said
[109]

Wait *v.* Wait.

that, when the husband is the offender, she shall forfeit her dower, as a condition of her divorce.

My conclusion, therefore, is, that the common law doctrine, *ubi nullum matrimonii, ibi nulla dos,* is not applicable to a divorce which admits the validity of the marriage, and dissolves it for some subsequent cause, as adultery. It is conceded that a divorce under the statute has no retro-active effect. Its operation is specifically defined. It has no other effect than that declared by the statute. When the wife is the complaining party, if she obtains a decree, the marriage is so far dissolved as to release the parties from the duty of mutual cohabitation, and, so far as her own property is concerned, the wife is as far as practicable, restored to the position in which she stood before the marriage. But in respect to the husband's property, her rights are not changed. She is still entitled to a support while the husband lives, and her dower in case she survives him. She and her children, alike unoffending, retain the same rights, as if the husband and the father had been faithful to his obligations. His offence works no forfeiture of their rights. The children will still inherit as heirs at law, and when they inherit, she may be endowed. The only difference is, that they inherit the lands not devised, of which the father at the time of his death was seised, while she is endowed of all the lands of which her husband was seised at any time during coverture. I think, therefore, the judgment below ought to be reversed, and a new trial awarded.

Ordered accordingly.