AEROPULSE, INC., Plaintiff,

v.

ARMSTRONG & BROOKS, LTD., David E. Flatow and Flatow and Company, Inc. d/b/a D.E.F. Brokerage Facility, Inc., Defendants.

No. 89–CV–0677(ERK).

United States District Court, E.D. New York.

June 8, 1990.

Kohn, Savett, Klein & Graf, P.C. by Harold E. Kohn, Joseph C. Kohn, Denis F. Sheils, Philadelphia, Pa., for plaintiff.

Ohrenstein & Brown by Mark J. Bunim, Geoffrey W. Heineman, Peter J. Biging, New York City, for defendants.

KORMAN, District Judge.

Plaintiff is a manufacturer of air pollution equipment. In late 1984, pursuant to a bid it wished to submit to the State of Colorado, plaintiff was required to obtain a surety bond to guarantee its payment and performance. Plaintiff's Vice President of Operations, John B. Hamblin, contacted Bruce Allen to seek his assistance in obtaining the bond. Allen was "an insurance producer" who advised clients "on how to deal with surety companies, how to deal with surety agents, what documents are necessary to present themselves to surety companies and [placed] some surety bonds directly with insurance facilities." Allen Deposition at 11–12.

After speaking with Hamblin, Allen contacted three or four "surety facilities," including Armstrong and Brooks ("A & B"), to request their assistance in procuring a surety bond for plaintiff. *Id.* at 33–34. A "surety facility," as defined by Allen, "is not a surety company although it is a source for surety bonds." *Id.* at 12. A & B eventually obtained a commitment for the bond from the Union Indemnity Insurance Company. A & B claims that it advised Allen that, in addition to the manual premium set by the New York State Insurance Department, it would charge a fee for the services it performed in placing the bond. Flatow Affidavit, June 19, 1989, at Paragraph 9. It also claims that Allen "clearly knew that of the $17,910 paid by plaintiff $6,709 went to Union Indemnity as gross premium (to include commissions) and $11,201 was A & B's service fee charge," *id.,* but Allen denies this. Allen

Deposition at 49; Allen Affidavit at Paragraph 4.

When Allen told Hamblin that the price of the bond would be thirty dollars per thousand dollars worth of coverage, totalling $17,910.00, Hamblin responded that the amount was much higher than plaintiff had previously paid for insurance. Hamblin Deposition at 20, 26–27. Allen explained that bonding companies were not interested in providing bonds for companies of the size and net worth of plaintiff and that the only alternative available to plaintiff was to obtain the bond through A & B. Hamblin Deposition at 20, 60; *see* Allen Deposition at 34–35. Allen instructed Hamblin to send the check for payment directly to A & B. Hamblin Deposition at 31.

Because plaintiff needed the bond quickly, it sent a check in the amount of $17,-910.00 before it received a billing invoice from A & B. Plaintiff's Memorandum in Opposition to Summary Judgment at Exhibit 12; Transcript of Oral Argument, October 20, 1989, at 9, 15. The invoice that eventually arrived stated that the payment was for the bond premium and a service fee, but did not specify the amounts of the two charges. Plaintiff's Memorandum in Opposition to Summary Judgment at Exhibit 9; Hamblin Deposition at 29. Plaintiff won the bidding and eventually completed the job without default.

In or about April 1985, plaintiff was notified by the New York State Insurance Department that the Union Indemnity Insurance Company, which had issued the surety bond, was being liquidated. Hamblin Deposition at 32. Hamblin telephoned A & B and requested the return of the full amount paid since it would not be bonded. He was told by an A & B employee that he would have to contact Union Indemnity to obtain a refund. Hamblin then called Union Indemnity and again asked for the return of the "17,900 and some odd dollars back." *Id.* at 33. Hamblin testified that he was told by an employee that "the only thing you might get back if it goes through is the cost of what we charged for securing the bond which was 2300 and some dol-

lars." *Id.* Hamblin subsequently obtained a copy of the cancelled check, upon which he discovered that A & B had remitted only $2,357.00 to Union Indemnity in payment of the premium. *Id.* at 33–34.

Plaintiff telephoned A & B a second time to ask why it had charged plaintiff more than fifteen thousand dollars to place the bond. Hamblin Deposition at 82. Upon receiving an unsatisfactory response, plaintiff informed the New York State Insurance Department by letter dated March 6, 1986 of the details of its transaction with defendants. Appendix to Plaintiff's Reply Memorandum in Support of its Motion for Class Certification at Exhibit I.

After a three year investigation of their business practices, a hearing officer of the Department of Insurance found that defendants had repeatedly violated New York Insurance Law § 2119 when they "issued billings to their clients which lumped together both the premium and the service fee as a single charge" without obtaining a signed memorandum specifying the amount of the service fee as required by the statute. Findings of Fact, Opinion and Decision of the New York State Insurance Department, *In the Matter of the Application and/or Licenses of DEF Brokerage Facility, Inc., et al.*, April 21, 1989, at 7.[1] The hearing officer characterized the dispute and the purpose of the Insurance Law as follows:

> The respondents' testimony that they rendered substantial services and that their clients willingly paid the service fees, is unrebutted in the record. On the other hand, the requirements of § 2119 are for the benefit of the consumer client, particularly the persons in the substandard market, those who are declined coverage in the standard market where only the manual premium is usually charged, who are most vulnerable to service fee charges to obtain the surety bond. They cannot obtain contracts to work without supplying a bond and are at the mercy of the respondents. The statute does not prohibit the imposition

of service charges by brokers; it requires only that the client be informed of that charge and that he consent in writing to it.

*Id.* at 6–7. The hearing officer then ordered respondents to make restitution of the service fees paid by their clients in the amount of $3.2 million and to pay the maximum penalties provided by law in lieu of the revocation of their licenses on the grounds that "they are untrustworthy to act as insurance agents and/or brokers within the meaning and intent of Section 2110 of the Insurance Law...." *Id.* at 9.

This decision was adopted by the Superintendent of the Department of Insurance on May 4, 1989, *id.* at 11, and was subsequently affirmed by the Appellate Division. *Montuori v. Corcoran*, App.Div., 557 N.Y. S.2d 313 (1st Dep't 1990). The Appellate Division found that:

> The Superintendent's determination, that petitioners violated Insurance Law § 2119(c)(1), by improperly collecting service fees from contractors for procuring surety bonds for them without obtaining a signed memorandum specifying the amount of the service fee, is supported by substantial evidence and rationally based.

> .        .        .        .        .

> In view of the 759 offenses found to have been committed by petitioners, the penalty imposed, namely revocation of petitioners' licenses unless they make restitution and pay $2,500 each in civil penalties, is neither shocking to one's sense of fairness, nor disproportionate to the offense.

*Id.* (citations omitted).

While its complaint was pending with the Department of Insurance, plaintiff filed the present class action. It alleged that A & B violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). It also alleged common law claims for fraud, money had and received, unjust enrichment, breach of contract, breach of fiduciary duty

---

**1.** The named respondents in the Department of Insurance's investigation were "DEF Brokerage Facility, Inc., David E. Flatow, individually and in his capacity as President and sublicensee of DEF Brokerage Facility, Inc. and Philip J. Montuori." *Id.* at 1.

and negligent misrepresentation, and a private cause of action under New York Insurance Law § 2119(c) and (d).

Defendants move for summary judgment on the ground that the evidence is insufficient to support a claim for common law or mail and wire fraud and, hence, plaintiff's RICO claim cannot be sustained as a matter of law. Defendants also invoke the doctrine of abstention with respect to plaintiff's common law claims on the ground that they are based on a violation of New York Insurance Law § 2119. According to defendants, abstention is warranted because "the very same questions ... are currently under review by the [state courts]" and because a decision on these claims would "interfere with state efforts to maintain a coherent policy in an area of comprehensive state regulation." Defendants' Memorandum in Support of Summary Judgment at 41. Moreover, defendants seek summary judgment as to plaintiff's claims against David E. Flatow in his individual capacity and Flatow and Company, Inc. d/b/a DEF Brokerage Facility, Inc., on the ground that plaintiff is unable allege any conduct by or communications with these defendants which would have given rise to any of the causes of action asserted in the complaint.

### Discussion

#### A. The Motions Directed to the Fraud and RICO Causes of Action

Plaintiff alleges that defendants' conduct constitutes common law fraud because A & B failed to disclose the amount of its commission. Plaintiff reasons that A & B, as fiduciaries of its insured, had a duty to disclose "all material facts which could affect Aeropulse's decision [to obtain insurance through them]." Plaintiff's Memorandum in Opposition to Summary Judgment at 13. Defendants move for summary judgment on this claim because the evidence fails to establish that plaintiff reasonably relied upon the amount of A & B's service fee in its decision to purchase the surety bond.

Under New York law, "[t]he elements of a cause of action for fraudulent conceal-

ment are: (1) relationship between the parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosures; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damage." *DuPont v. Brady*, 646 F.Supp. 1067, 1075 (S.D.N.Y.1986), *rev'd on other grounds*, 828 F.2d 75 (2nd Cir.1987), *on remand*, 680 F.Supp. 613 (S.D.N.Y. 1988). A relationship that creates a duty to disclose arises where, as alleged here, "the parties enjoy a fiduciary relationship." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2nd Cir. 1984); *see Ettinger v. Merrill Lynch, Pierce, Fenner & Smith*, 835 F.2d 1031, 1033 (3rd Cir.1987); 68 N.Y.Jur.2d Insurance § 441 (1988).

Even assuming that A & B willfully concealed the amount of its service fee in order to defraud plaintiff, plaintiff has failed to come forward with evidence establishing that, had it known the amount of the service fee, it would have refused to obtain the surety bond through A & B. Plaintiff concedes that its Vice–President of Operations, John Hamblin, knew that plaintiff was being charged a service fee by A & B to procure the bond and he did not ask for a breakdown of the amounts of the premium and service fee before mailing a check to A & B for payment. Hamblin Deposition at 28, 75. Although Hamblin first testified that A & B misled him "after the fact" as plaintiff was "charged an exorbitant amount to procure this bond once we found out what [A & B] paid for the bond," *id.* at 53, he later admitted that he did not think that he had been misled. *Id.* at 79. He also denied knowledge of anyone at A & B having made a false statement, either in writing or orally, to himself or to anyone else at Aeropulse. *Id.* at 77.

Perhaps the crucial testimony by Hamblin on the issue of whether the alleged fraudulent omission affected plaintiff's conduct was the following exchange at his deposition:

Q. Do you believe that there was any material fact that Armstrong and Brooks

omitted to tell you prior to your obtaining the surety bond?

. . . . .

A. They certainly omitted telling me how much their charges were and how much the bond was going to cost them. They did not give me a breakdown of what the $17,900 was, how that would be allocated.

Q. Did you ever ask them for such a breakdown?

A. I did not.

Q. Did Bruce Allen ever give you a breakdown?

A. He did not.

Q. Did you ever ask him for a breakdown?

A. I did not.

Q. Do you believe had you received such a breakdown that you would have not gone forward with the bond at that time?

. . . . .

A. It's difficult to know what we would have done. We would have certainly explored our other options.

Q. What were your other options?

A. Time was of the essence. We didn't really have any other options, quite frankly.

Hamblin Deposition at 74–76 (objections omitted).

The concession that plaintiff "didn't really have any other options" for obtaining a surety bond is supported by the testimony of plaintiff's insurance agent, Bruce Allen. Allen testified that he went to A & B with "[h]igher risk, specialized, difficult to place business." Allen Deposition at 25. He explained that plaintiff's "financial condition at the time did not allow them to go to any standard markets" and that plaintiff "had been turned down by other people" for a surety bond before he contacted A & B. Id. at 33. Elaborating on what made plaintiff a "tough risk," Allen listed plaintiff's "[p]oor profit performance, very very weak financial condition, very very high, difficult, projects to undertake, very high, the equity, very minimal management abilities...." Id. at 34. He added that of the four surety facilities he approached to place the bond on plaintiff's behalf, only A & B came back with an offer to thoroughly underwrite the account. Id. at 34–36.

Other evidence in the record confirms that A & B was plaintiff's only hope of obtaining a surety bond and competing for the Colorado job. Hamblin admitted that there were strict time constraints to submit the bond and that "[t]he State of Colorado was pushing me at this time for this particular bond." Hamblin Deposition at 30. Allen testified that he "informed Aeropulse that the price of the bond in this secondary market would exceed the prices in the standard market. It was my understanding that Aeropulse had been turned down in the standard market due to its financial condition." Allen Affidavit at Paragraph 3. It was only after Allen had apprised Hamblin of this information that Hamblin decided to purchase the bond through A & B.

Plaintiff's submission of the affidavit of Ralph Murphy, President of Aeropulse, Inc., adds nothing to its case. Murphy alleges that, "[h]ad I known the amount of the service charge, I would have protested, not paid it, and attempted to obtain the bond directly, or through another broker." Murphy Affidavit at Paragraph 11. Although Murphy was President of Aeropulse, there is no evidence in the record that he was or would have been personally involved in procuring the bond. Rather, Hamblin testified that Murphy was "primarily engaged in selling," whereas Hamblin, as Vice–President of Operations, was "involved in everything but selling" and that he "essentially [took] care of the financials." Hamblin Deposition at 6. This evidence indicates that Hamblin was authorized to procure the bond without having to consult Murphy. Indeed, this appears to be what Hamblin did, despite the fact that he found the price of the bond to be much higher than expected.

Even if Murphy would have "protested" and "attempted to obtain the bond directly, or through another broker," plaintiff has not offered any evidence that he could have succeeded. On the contrary, the unrebut-

ted evidence shows that A & B was the only surety facility of the four contacted who offered to underwrite the bond, that plaintiff was only able to obtain insurance in the higher-priced secondary market due to its size and financial worth and that time constraints made it imperative for plaintiff to obtain the bond quickly in order to perform under its contract with the State of Colorado. Under these circumstances, Murphy's speculation about what he would have done is insufficient to establish a genuine issue of fact for trial.[2]  *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2nd Cir.1985) ("Once a moving party has made a showing that no material issues of fact are in dispute, mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.") (citation omitted).

While Murphy could have refused to purchase the bond through A & B because of its exorbitant service fee, even if that meant losing a lucrative contract, this possibility is not sufficient to defeat a motion for summary judgment. Plaintiff was perfectly willing to pay a combined premium and service fee of $17,910.00 to obtain the bond. It is inconceivable that plaintiff would have chosen to forego a contract with the State of Colorado because it objected to the manner in which the $17,910.00 was divided between the broker and the insurer. More significantly, plaintiff did not submit an affidavit from a responsible official even remotely suggesting that it would have done so. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Accordingly, summary judgment is granted for defendant on plaintiff's claim for common law fraud.[3]

■ The same reasons for granting summary judgment on plaintiff's common law fraud claim are applicable to plaintiff's RICO claim. Plaintiff alleges that, by "charging and receiving unlawful and excessive commissions on a wide-scale basis," defendants devised and carried out a fraudulent scheme through use of the mails and interstate wires in violation of 18 U.S.C. § 1962(c). Amended Complaint at Paragraphs 63, 66. In order to prove a RICO violation, a plaintiff has two burdens of proof. First, he must prove the five constituent elements of a RICO claim: (1) that the defendant, through the commission of two or more predicate acts, (2) constituting a "pattern" (3) of "racketeering activity," (4) directly or indirectly invests in, or maintains an interest in, or participates in an "enterprise," (5) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962 (1984); *see Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2nd Cir.1983). Second, a plaintiff must prove that he was "injured in his business or property by reason of [the] violation...." 18 U.S.C. 1964(c) (1984); *see Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2nd Cir.1990).

Whether defendants actually schemed to defraud plaintiff and other insureds by charging undisclosed, unlawful and excessive fees to procure insurance, plaintiff was not injured because it would have purchased the surety bond through A & B

---

**2.** There is no evidence in the record to suggest that it would have been possible for plaintiff to bypass a broker and obtain a bond directly from a surety insurance company. Otherwise, the hearing officer for the Department of Insurance hardly would have found that consumers of surety bonds, particularly those who are declined coverage in the standard market and are most vulnerable to service fee charges, are "at the mercy of [insurance brokers]" in order to obtain performance bonds. *See* Findings of Fact, Opinion and Decision of the New York State Insurance Department, *In the Matter of the Application and/or Licenses of DEF Brokerage*

*Facility, Inc., et al.*, April 21, 1989, at 6–7. *See also* 1978 Annual Report of the Temporary Commission of Investigation of the State of New York 149 (April 1979) (describing the "American agency system" as "the practice whereby all policies written by [insurance] carriers will have a designated private broker").

**3.** Plaintiff's claim for negligent misrepresentation fails for the same reasons as its fraud claim. *See Alice D. v. William M.*, 113 Misc.2d 940, 450 N.Y.S.2d 350 (N.Y.Civ.Ct.1982).

even if it had known the amount of the service fee. *Cf. Peil v. Speiser,* 806 F.2d 1154, 1161 (3rd Cir.1986) (Defenses available to a claim under Section 10(b) of the Securities Exchange Act of 1934 include that "plaintiffs knew of the falsity of defendants' representations or would have purchased the stock even if they had known of them."). While plaintiff need only prove that defendants devised a scheme to defraud in order to establish the predicate acts of mail fraud, unlike the Government in a mail fraud prosecution,[4] plaintiff must prove that the fraudulent scheme actually succeeded in causing monetary loss to prevail on its claim for damages. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d at 23. Plaintiff has failed to controvert the evidence submitted by defendants that it did not suffer any damage as a result of the fraudulent nondisclosure because it would have paid $17,910.00 to obtain the bond even if it had known exactly how that sum was divided between the broker and the insurer. Accordingly, summary judgment is granted for defendants on this claim.

### B. *The Motions Directed to Plaintiff's Pendant Common Law Claims*

■ Only one of plaintiff's common law causes of action requires extended discussion. In its fourth cause of action, plaintiff alleges that defendants were unjustly enriched because they received compensation from their insureds without having obtained a signed, written agreement as required by New York Insurance Law Section 2119(c) and (d). In order to recover for unjust enrichment, a plaintiff must show that: 1) the defendant was enriched; 2) such enrichment was at the expense of the plaintiff; and 3) the circumstances were such that, in equity and good conscience, the defendant should make restitution. *Chase Manhattan Bank v. Banque Intra, S.A.,* 274 F.Supp. 496, 499 (S.D.N.Y.1967). Plaintiff alleges that defendants were enriched when they were compensated for procuring the surety bond, that the enrich-ment was at its expense and that equity and good conscience require that restitution be made because the defendants obtained the compensation in violation of New York law which makes it a crime for a broker to "receive any compensation" from an insured "other than commissions deductible from premiums on insurance policies or contracts, ... unless such compensation is based on a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation." N.Y. Ins.Law § 2119(c)(1) (McKinney 1985).

Equity and good conscience normally require a party who has illegally obtained money in performance of a contract to make restitution to the party from whom he received the money. "[O]nly when restitution is in conflict with overriding policies pursuant to which the transaction is made illegal" should restitution be denied. G. Palmer, *The Law of Restitution* § 8.1, at 171 (1978). While restitution has often been denied where the parties are deemed to have been equally at fault or *in pari delicto* in an illegal transaction, equality of fault is almost always absent "where the transaction is made illegal for the purpose of protecting one party against the other. When a legislative prohibition of certain acts is for the benefit of a small or large class (perhaps the public at large), the illegality will not prevent restitution in favor of a person in the protected class." *Id.* at § 8.6, at 206.

The cases in which a plaintiff is permitted to maintain an action to recover the amount of surplus interest paid on a usurious loan are illustrative. As Lord Mansfield observed in *Smith v. Bromley,* 2 Doug. 696, 697 (1760):

[A]n action would lie to recover back the surplus of interest, if the principal and legal interest had been paid; and that the man who, from mere necessity, pays more than the other can in justice demand, and who is called in some books

---

4. *See, U.S. v. Dixon,* 536 F.2d 1388, 1399 n. 11 (2nd Cir.1976) ("We are, of course, aware of our decisions that since the statute requires only a scheme to defraud and not actual fraud 'it is not essential that the Government allege or prove that purchasers were in fact defrauded.'") (citations omitted).

*the slave of the lender,* cannot be said to have paid it willingly. If it be illegal and iniquitous in the defendant to *take,* it was so to *detain.* If the act be in itself immoral, or a violation of the general laws of public policy, there the party paying shall not have his action, for where both parties are equally criminal against such general laws, the rule is *potior est conditio defendentis.* But there are other laws which are calculated for the protection of the subject against oppression, extortion, deceit, & c.; and if such laws are violated, and the defendant takes advantage of the plaintiff's condition or situation, there the plaintiff shall recover; and it is astonishing the reports do not distinguish between the violation of the one sort and of the other.

*Id., quoted in Palmer v. Lord,* 4 N.Y. 95, 100–01 (1822); *see generally,* Annotation, *Right, in Absence of Statute Expressly So Providing, to Recover Back Usurious Payments,* 59 A.L.R.2d 522, 527–537 (1958). The linchpin of these cases is the violation of a statute whose primary purpose is to protect persons in need of capital from unscrupulous lenders. *See* Wade, *Restitution of Benefits Acquired Through Illegal Transactions,* 95 U.Pa.L.Rev. 261, 270 (1947) ("[T]he parties are not *in pari delicto* when the statute which they have violated was enacted for the purpose of protecting the group of persons to which one party belongs from the group to which the other belongs.").

An action for unjust enrichment will lie in the present case because Section 2119 was enacted to protect plaintiff and the group to which it belongs from the misconduct alleged in the complaint. As the hearing officer for the Department of Insurance found:

[T]he requirements of § 2119 are for the benefit of the consumer client, particularly the persons in the substandard market, those who are declined coverage in the standard market where only the manual premium is usually charged, who are most vulnerable to service fee charges to obtain the surety bond. They cannot obtain contracts to work without supplying a bond and are at the mercy of [insurance brokers].

Findings of Fact, Opinion and Decision of the New York State Insurance Department, *In the Matter of the Application and/or Licenses of DEF Brokerage Facility, Inc., et al.,* April 21, 1989, at 6–7. An examination of the text and legislative history of New York Insurance Law § 2119 supports this conclusion.

Section 2119(c) and (d) of the New York Insurance Law provides:

> § 2119. Insurance agents, brokers, consultants; written contract for compensation; excess charges prohibited
>
> (c)(1) No insurance broker may receive any compensation, other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the negotiation or procurement of, or other services in connection with, any contract of insurance made or negotiated in this state or for any other services on account of such insurance policies or contracts, including adjustment of claims arising therefrom, unless such compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation. (d) No insurance broker shall, in connection with the negotiation, procurement, issuance, delivery or transfer in this state of any contract of insurance made or negotiated in this state, directly or indirectly charge, or receive from, the insured or prospective insured therein any greater sum than the rate of premium fixed therefore by the insurer obligated as such therein, unless such broker has a right to compensation for services created in the manner specified in subsection (c) hereof.

N.Y.Ins.Law § 2119 (McKinney 1985).

The precursor to Section 2119 was Section 169(2). Passed in 1918 and limited to the procurement of marine insurance, the statute provided:

> No person, partnership, association or corporation, whether acting as broker,

agent, or otherwise in connection with the negotiating for or the issuance, delivery or transfer in this state of any binder, cover note, policy or other evidence of a contract of insurance appertaining to or connected with marine risks and risks of transportation and navigation ... shall, directly or indirectly, charge or receive from any person to whom such binder, cover note, certificate or other evidence of a contract of insurance is negotiated, issued, delivered or transferred, any greater sum than the rate of premium fixed therefor by the insurance corporation or underwriter obligated by way of indemnity in case of loss; provided that nothing contained herein shall prevent any duly licensed marine insurance broker from making a special contract in writing for compensation to be paid by the person by whom such broker is employed to negotiate or place insurance, and provided, further, that the said contract shall clearly state or define the amount or extent of such compensation.

Act of May 8, 1918, ch. 552, 1918 N.Y.Laws 1768.

Prior to 1918, insurance brokers were prohibited from collecting any compensation from an insured. Section 169(2) was enacted in response to the "shortage of shipping, and of marine insurance thereon, during the world war." Revision Committee of the New York Insurance Law, Tentative Draft § 58.5 (1937), *reprinted in* A. Kaplan & G. Gross, *Commentaries on the Revised Insurance Law of New York* § 129, at 320–21 (1940). The passage of Section 169(2) encouraged brokers to place insurance in the shipping and marine industries by allowing them to seek compensation over and above their commission on the premium. At the same time, Section 169(2) made it "a misdemeanor, and a ground for revocation of license, if a broker collect[ed] any compensation from the insured, unless he ha[d] a specific written contract therefor." *Id.*

The entire body of insurance law was recodified in 1939 and Section 169(2) was extended to cover all types of contracts made by insurance brokers. The new statute provided:

§ 129. Insurance Brokers; Written Contract for Compensation by Insured; Excess Charges Prohibited

1. No insurance broker shall have any right to compensation other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the negotiation or procurement of, or other services in connection with, any contract of insurance made or negotiated in this state, unless such right to compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation. Nothing herein contained shall affect the right of any such broker to recover from the insured the amount of any premium or premiums for insurance effectuated by or through such broker.

2. No insurance broker shall, in connection with the negotiation, procurement, issuance, delivery or transfer in this state of any contract of insurance made or negotiated in this state, directly or indirectly charge, or receive from, the insured or prospective insured therein any greater sum than the rate of premium fixed therefor by the insurer obligated as such therein, unless such broker has a right to compensation for services created in the manner specified in subsection one.

Act of June 15, 1939, ch. 882, 1939 N.Y. Laws 2628–29.

The Revision Committee commented upon the proposed provisions of § 129 as follows:

The present law [section 169(2)] is restricted to marine insurance contracts.... It is here extended to cover all kinds of insurance. It is customary for the broker to receive his compensation exclusively from the insurer. Any agreement by the insured to pay compensation to the broker is so unusual that it should be put in writing.

Under subsection 2 it is a misdemeanor, and a ground for revocation of license, if

a broker collects any compensation from the insured, unless he has a specific written contract therefor. This is substantially the same as present § 169(2).[5]

Revision Committee of the New York Insurance Law, Tentative Draft § 58.5 (1937), *reprinted in* A. Kaplan & G. Gross, *Commentaries on the Revised Insurance of New York* § 129, at 320–21 (1940).

The 1939 revision to Section 169(2) strikes the same balance as the original statute. While the Legislature expanded the types of insurance for which a broker could charge a fee, it also added the clause "excess charges prohibited" to the title of the statute, making it illegal for brokers to charge an unreasonable fee regardless of whether they obtain a signed agreement for it. Act of June 15, 1939, ch. 882, 1939 N.Y.Laws 2628–29.

In 1952, the Legislature again expanded the applicability of Section 129(1) to all services provided by an insurance broker "on account of such insurance policies or contracts, including adjustment of claims arising therefrom...." N.Y.Ins.Law § 129(1) (McKinney 1953). In a memorandum in support of the proposed revision, the Department of Insurance reasoned that:

> Since an insurance broker receives his compensation for writing insurance from the insurer in the form of commissions normally, it is not to be expected that he would have a right to any compensation for such services from the insured or prospective insured in the absence of a special agreement. Therefore, in order to protect such insured or prospective insured from a baseless claim made by an insurance broker, the Legislature, in enacting Section 129, requires that such agreement providing compensation to be payable by the insured or prospective insured shall be in writing. This section

is based upon the same philosophy as the 'Statute of Frauds.'

The Department from time to time has received complaints from insureds that insurance brokers were making claims for compensation for services in adjusting losses under insurance policies, based upon alleged verbal agreements. Here, again, is a situation where normally insurance brokers, as a part of their service to clients, assist them in the adjustment of a loss without expectation of payment for their services.

.   .   .   .   .

The Department in passing upon complaints involving such claims is not in a position to protect the public against unwarranted claims made on the part of insurance brokers, since we cannot undertake the judicial function of weighing the evidence which is based upon verbal conversations. In our opinion an insured should not be subjected to a claim made by an insurance broker for compensation for services rendered by him in adjusting a loss unless evidenced by an agreement in writing....

Insurance Department Recommendations, 1952 McKinney's Session Laws 1229–30; *see H.L. Fox Co., Inc. v. William Kaufman Organization, Ltd.*, 74 N.Y.2d 136, 141–42, 542 N.E.2d 1082, 1085, 544 N.Y.S.2d 565, 568 (1989).

In 1972, the first clause of the first sentence of Section 129(1) was changed from "No insurance broker shall have any right to receive compensation ..." to "No insurance broker may receive any compensation...." Act of May 24, 1972, ch. 498, 1972 McKinney's Session Laws 1017, 1019–20. In 1984, the entire body of insurance law was once again recodified and Section 129(1) and (2) became Section 2119(c) and (d) respectively. N.Y.Ins.Law § 2119 (McKinney 1985).

---

**5.** Section 5 of the 1939 Revision to the Insurance Law provided:
> Penalties. Every violation of any provision of this chapter shall, unless the same constitutes a felony, be a misdemeanor. Every penalty imposed by this section shall be in addition to any penalty or forfeiture otherwise provided by law.

Act of June 15, 1939, ch. 882, 1939 N.Y.Laws 2534. The 1984 recodification of the Insurance Law resulted in Section 5 being recodified as Section 109. N.Y.Ins.Law § 109 (McKinney 1985). The text of the section remains unchanged.

While Section 2119 is similar to a statute of frauds, it is "more exacting"[6] and is intended to do more than merely protect an insured from the baseless claim of an insurance broker. If that was its sole purpose, it could have been accomplished by simply allowing the insured to avoid liability by asserting the absence of the requisite writing as a defense to an action by the insurer.

Section 2119 does considerably more than this. It flatly forbids *receipt* of compensation in the absence of the requisite writing. Violation of this prohibition subjects an insurer to substantial criminal and civil penalties. Obviously, the statutory scheme reflects a desire on the part of the Legislature to deter brokers from receiving payments in the absence of the requisite writing.

The reason for this policy seems equally obvious. By allowing brokers to receive compensation in addition to the commissions they receive from insurers, the Legislature sought to encourage brokers to provide needed services to insureds. On the other hand, by requiring a writing setting forth the precise amount of such compensation, the Legislature sought to ensure that the purchaser of insurance was fully aware that the broker was receiving additional compensation. Otherwise, the insured might be paying such additional compensation without knowing that he was doing so or without knowing the amount of the additional compensation he was paying. The factual record indicates that this may be precisely what happened in the present case.

Affording plaintiff restitution furthers the overriding policy of the law by restoring that which was obtained from plaintiff in violation of procedures intended to protect it from unscrupulous practices. Moreover, making restitution available in such cases plainly operates to deter future violations of the law. As Lord Mansfield aptly observed, "it is necessary, for the better support and maintenance of the law, to allow the action, for no man will venture to *take*, if he knows he is liable to *refund*." *Smith v. Bromley*, 2 Doug. 696, 697 (1760), *quoted in Palmer v. Lord*, 4 N.Y. 95, 101 (1822). *See also* Wade, *Benefits Obtained Under Illegal Transactions—Reasons For and Against Allowing Restitution*, 25 Tex.L.Rev. 31, 56–57, n. 114 (1946); *Meech v. Stoner*, 19 N.Y. 26, 28 (1859).

Defendants' invocation of the abstention doctrine with respect to plaintiff's common law claims for unjust enrichment, money had and received, breach of contract, breach of fiduciary duty and negligent misrepresentation requires little in the way of discussion. The issue of whether Section 2119 is applicable to defendants' conduct has been decided by the New York State Insurance Department and affirmed by the Appellate Division. Indeed, except for A & B, which was not a party to the administrative action, defendants are collaterally estopped from relitigating the issue here.

Furthermore, the adjudication of plaintiff's common law claims does not interfere with state efforts to maintain a coherent policy in an area of comprehensive state regulation. The Superintendent of Insurance is still free to order whatever relief he deems appropriate in any given circumstance.[7] Allowing plaintiff to pursue his common law claims will further the state's policy of deterring brokers from making oral contracts for compensation with in-

---

**6.** In *H.L. Fox Co. v. William Kaufman Organization*, 74 N.Y.2d 136, 542 N.E.2d 1082, 544 N.Y.S.2d 565 (1989), the New York Court of Appeals found that Section 2119 was "more exacting" than a traditional statute of frauds because it required the parties "to agree on a clearly defined price, with their agreement being evidenced in a writing signed by the party to be charged." *Id.* at 141, 542 N.E.2d at 1085, 544 N.Y.S.2d at 568. The Court held that plaintiff, an insurance broker seeking to recover the alleged amount of his unpaid commission, "[could not] satisfy the requirements of section 2119 by piecing together multiple writings because there [was] no writing signed by defendants 'specifying or clearly defining' the amount to be paid or referring to a document to do so." *Id.* at 143, 542 N.E.2d at 1086, 544 N.Y.S.2d at 569.

**7.** The Superintendent of Insurance ordered defendants to return the service fee they charged *or* forfeit their licenses if they failed to do so. There is no certainty that plaintiffs and others similarly situated will actually obtain restitution pursuant to the order of the Superintendent.

sureds and from charging excessive service fees to procure insurance.

Accordingly, there is no reason to abstain from deciding these claims. Because defendants chose to rest their motion for summary judgment as to plaintiff's common law claims solely on the doctrine of abstention,[8] and because the remaining claims so closely parallel the elements of the unjust enrichment claim, it is appropriate to defer consideration of the merits of these claims until trial.

C. *The Motion Directed To David E. Flatow in his Individual Capacity and to Flatow and Company, Inc. d/b/a DEF Brokerage Facility, Inc.*

█ Defendant argues that it was "blatantly inappropriate" for plaintiff to name David E. Flatow in his individual capacity or as Vice–President of A & B in its complaint because John Hamblin, Vice–President of Operations at Aeropulse, testified that Flatow never directly communicated with anyone at Aeropulse. In response, plaintiff argues that Flatow should be held personally liable and that the corporate veil should be pierced in order to achieve equity in this case.

Plaintiff relies upon the findings of the New York State Insurance Department that Flatow "took an active role in managing and directing the business of Armstrong and Brooks, Ltd." and that, along with the President of A & B, he exercised effective control over A & B's activities. Findings of Fact, Opinion and Decision of the New York State Insurance Department, *In the Matter of the Application and/or Licenses of DEF Brokerage Facility, Inc., et al.*, April 21, 1989, at 2, 9. The Department of Insurance also found that Flatow received a salary of $4,000 a week, which was the same amount paid to the President of A & B, and that 50% of the surplus funds generated by A & B "were

paid to entities controlled by Mr. Flatow, usually DEF Brokerage Facility, Inc....." *Id.* at 2. Presumably on the basis of these findings, the hearing officer concluded that Flatow should be individually responsible:

> for restitution in circumstances where the corporate licensee, Armstrong & Brooks, Ltd., which is no longer licensed and is not a party to this proceeding, received the unlawful fees.... Where, as here, individual trustworthiness is the issue before the Superintendent, the corporate structure does not stand as an iron curtain barring the regulator's scrutiny or remedial power.

*Id.* at 8. This finding is sufficient to raise an issue of fact regarding Flatow's use of A & B as nothing more than his personal vehicle and summary judgment is denied on this claim.

Defendants also fail to demonstrate the absence of a genuine issue of fact as to the liability of Flatow and Company, Inc. d/b/a DEF Brokerage Facility Inc. ("DEF"). The hearing officer for the Department of Insurance found that:

> In the 759 transactions involving surety bonds shown by the record in this case, transacted between 1982 and 1985, Armstrong & Brooks, Ltd., and respondents DEF Brokerage Facility, Inc. or respondent David E. Flatow acting either individually or in concert with each other in the capacity of agents and/or brokers collected service fees amounting to $3,204,088 from contractor clients who were sold surety bonds.

*Id.* at 3; *see also id.* at Paragraphs 10, 11. The hearing officer also found that DEF was the repository of the surplus funds paid to Flatow from A & B. *Id.*[9]

### Conclusion

Defendants' motion for summary judgment is granted as to plaintiff's first cause

---

**8.** Defendants also seek dismissal of the second cause of action based on Section 2119 on the grounds that the Legislature neither expressly provided nor intended to provide insureds with a cause of action for damages against insurance brokers. Because plaintiff's claim for unjust enrichment would provide as much relief as a cause of action for damages under Section 2119, it is unnecessary to decide whether Section 2119 creates a private cause of action.

**9.** Defendants' submission of the November 1986 Certification of Incorporation of an entity entitled "Flatow & Company Inc." is not dispositive of whether the party identified in the complaint as "Flatow and Company, Inc. d/b/a DEF Brokerage Facility, Inc." is liable to plaintiff on its common law claims.

of action for fraud, its seventh cause of action for negligent misrepresentation and its eighth cause of action under RICO. Defendants' motion for summary judgment is denied as to plaintiff's claims against David E. Flatow in his individual capacity and Flatow and Company, Inc. d/b/a DEF Brokerage Facility, Inc.

Defendants' motion for summary judgment is also denied as to plaintiff's third, fourth, fifth and sixth causes of action for money had and received, unjust enrichment, breach of contract and breach of fiduciary duty respectively and its second claim for a private cause of action based on New York Insurance Law § 2119.[10]

SO ORDERED.

10. Defendants' argument that the dismissal of plaintiff's RICO claim destroys the basis for the exercise of federal jurisdiction over plaintiff's claims based on New York law is without merit. Plaintiff has demonstrated that it satisfies the citizenship and monetary requirements of diversity jurisdiction as to sustain its action. Plaintiff is a Pennsylvania corporation and is of diverse citizenship from defendants, who are either incorporated in or citizens of New York or New Jersey. Moreover, because this action was commenced before May 1989, plaintiff need only plead damages in excess of $10,000 to seek relief in federal court. By defendants' own admission, plaintiff paid A & B over $11,000 to procure a surety bond on its behalf. Flatow Affidavit, June 19, 1989, at Paragraph 9; Flatow Affidavit, August 23, 1989 at Paragraph 5. The fact that A & B chose to give a portion its service fee to Bruce Allen is not dispositive of the issue of whether plaintiff can sustain its action to recover the full amount paid to A & B.