**WALT DISNEY PRODUCTIONS, Plaintiff,**

v.

**John BASMAJIAN and Christie, Manson & Woods International, Inc., Defendants.**

**No. 84 Civ. 8682 (RLC).**

United States District Court, S.D. New York.

Dec. 13, 1984.

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff; Thomas R. Trowbridge III, William J. Ruane, Robin Kaufman, New York City, of counsel.

Gold, Farrell & Marks, New York City, for defendant John Basmajian; Martin R. Gold, Carl H. Tessler, New York City, of counsel.

Simpson, Thacher & Bartlett, for defendant, New York City, Christie, Manson & Woods Intern., Inc.; Conrad K. Harper, Albert E. Kotite, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff Walt Disney Productions ("Disney") seeks a preliminary injunction to restrain Christie, Manson & Woods International, Inc. ("Christie's") from proceeding with an auction scheduled for Saturday, December 8, 1984, of various Disney celluloids ("cels"), background, preproduction and production sketches on consignment from John Basmajian, Sr. This is a collection of original Disney artwork, including animated cels and background drawings used in the production of Disney motion

pictures which are all under copyright. Disney asserts that Basmajian took the art work from Disney studios without permission and that sale of the artwork now would infringe Disney's copyright, 17 U.S.C. § 106.[1]

Basmajian[2] worked at Disney's in the animation department in 1943–46. There is no dispute about that. According to John Hench, who has worked at Disney's since 1939 and is now a senior vice president of WED Enterprises, a Disney affiliate, during the period of Basmajian's employment, cels and sketches were not supposed to be taken off the premises of the studio without permission. The cels were kept near the cameras until after completion of any retakes. Then they were stored in the morgue. Background sketches, exposure and model sheets were stored in the morgue, as well.

During the period when Basmajian was employed, the estimate is that some 20 million pieces of artwork (cels and sketches) were completed in connection with the Disney short subjects and feature films. Hench testified that roughly 10% of this material was considered important. Some of this material was used again, some was sold to the public through an authorized vendor, Courvoisier Galleries. David R. Smith, who came on as Disney's archivist in June, 1970, testified that Disney has only some 50 cels and sketches from this 1943–46 period in its possession at present.

According to Basmajian, Disney systematically destroyed the cels and sketches kept in the morgue. Basmajian states that he secured the permission of Disney employees, John Bond and Ben Mosley, to take from the morgue the material which now comprise his Disney collection (and part of

which he proposes to sell through Christie's). It is undisputed that Bond worked at Disney in the animation department during the period of Basmajian's employment and until Bond's retirement in 1973. According to Basmajian, Bond was head of the animation department. It is also undisputed that Mosley worked in the morgue during the period Basmajian was at Disney.

According to Basmajian's son, John Basmajian, Jr., the collection was kept at the Basmajian home and was shown to anyone who came to visit. Much of it was stored in the garage but pieces were on display throughout the house all during Basmajian, Jr.'s years at home. (The son is now 43 years old and was born in 1941.) Some 20 years ago Basmajian, Sr. and his wife began to make mats and place these pieces in frames.

Basmajian, Jr. until a few years ago taught at Pasadena City College and was a colleague of David Smith's father. Basmajian, Jr. spoke to Smith's father about the Disney cels and sketches in Basmajian, Sr.'s possession. Smith's father obviously relayed this information to Smith, because the latter wrote to Basmajian on October 29, 1970, inquiring about his possession or knowledge of Disney artwork or memorabilia. On the witness stand Smith said he did not know that Basmajian had any artwork. I cannot credit that.

In December, 1983, Christie's entered the picture. Through Basmajian's lawyer or agent, Christie's representatives met Basmajian, saw the collection and entered into an agreement to auction it off. In July, 1984, when the date for the December auction had been set, Hilary Holland, a Christie's employee working in Los Angeles, con-

---

1. Disney also makes several state law claims— that Basmajian converted the artwork and breached his contract of employment with Disney, and that Disney is entitled to return of the artwork based on a theory of constructive trust.

2. Basmajian is now 85 years old. He is a resident of California. Plaintiff filed this action on Monday, December 3. The matter was set down for hearing on December 6 and 7. Basmajian submitted an affidavit. In view of the time

pressures created by plaintiff instituting suit so close to the date of the auction, the court could hardly expect an 85 year old man who, the court is advised, is somewhat infirm to be present in New York on December 6 and 7 in person. Had plaintiff filed this action earlier, perhaps Basmajian could have come to New York in person or his testimony could have been preserved in a deposition. Under the circumstances, the affidavit must be accepted.

cluded that it would be a good idea to have a charity benefit co-sponsored by Disney and Christie's given close to the date of the auction. She voiced this idea to Disney personnel in August, 1984. During the course of these discussions, Holland told Disney representatives about the Basmajian collection, what Christie's had been told about how Basmajian came into possession of the material—that the material was being destroyed and thrown out and that he had been given permission to take cels and sketches home—and Christie's plan to auction the materials off in the first week of December. The benefit proposal was turned down. In September, Holland talked to Disney's general counsel. Again she was forthright about revealing all she had been told about how the Basmajian collection came into being. The general counsel told her he would look into it.

Smith and Basmajian, Jr. agree that they met in June when the latter brought some 20 cels to the former seeking to verify their origin. Smith puts the date in June in 1984, Basmajian in 1983. I accept the 1983 date.

 In order to secure a preliminary injunction in this circuit, a plaintiff must show irreparable injury and either the likelihood of success on the merits or serious questions going to the merits making them a fair ground for litigation with the balance of hardships tipping in favor of the plaintiff. *Jackson Dairy, Inc. v. E.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). The absence of a showing of irreparable injury is fatal.

One of the affidavits presented in this case is that of Peter F. Nolan, Disney Vice President, Rights and Business Affairs, Consumer Products. He requests return of the artwork and cancellation of the auction because "this unique property belongs to [Disney], because Disney must maintain its policy of prohibiting its employees from obtaining property belonging to Disney and because Disney needs to protect its own program of selling this material, which currently produces revenue of about $270,000 per year." (par. 12, Nolan Aff.). Disney wants to protect its monetary interest in

materials which comprise the Basmajian collection and/or it wants to make a market for the material itself. In either case the damage it seeks to avert is one that can be calculated in dollars and cents. Those are not damages requiring equitable relief but mere legal damages capable of evaluation by a jury. *Jackson Dairy, Inc. v. E.P. Hood & Sons, id.; Kamakazi Corp. v. Robbins Music Corp.*, 534 F.Supp. 57, 68 (S.D.N.Y.1981) (Sweet, J.).

Moreover, Basmajian has established a prima facie case of lawful possession of the collection. The story of how he came into possession of the material is more plausible and more consistent with the objective facts than plaintiff's testimony seeking to establish wrongful conversion. Whatever Bond's and Mosley's position, they clearly had access to the cels and sketches. Mosley worked in the morgue where the sketches, and eventually the cels, were stored. Bond was supervisor of cleanup and breakdown. That meant putting finishing touches on the cels and sketches, and it also meant breaking down the sets when shooting was completed. Thus both Bond and Mosley had control of material that was ready to be discarded or destroyed and had authority to give to Basmajian material the studio was prepared to get rid of as waste. Hench testifies that the studio placed great value on these cels and sketches. But on what is a conservative estimate of some 20 million cels, sketches, etc. created during the period in question, with 2 million of them being of value, and with Disney now in possession of only 50 of these materials, it is clear enough that the studio did not place great value on most of this kind of material. Some were considered of sufficient value to sell to the public through a vendor. No estimate is in the record of numbers in this regard, but it is safe to estimate that the numbers were in the hundreds and no more than several thousand. That leaves millions of pieces of cels, sketches, etc. unaccounted for. The purported careful policy of preservation on this evidence was simply non-existent.

The evidence shows that Basmajian openly displayed this material at home to all who visited including Disney employees. While much of the material was kept in the garage, beginning in roughly 1960 Basmajian began a program of careful preservation—mounting the material on mats and framing the various pieces. In the last 2 years the son has taken on the task of cataloging the items. Disney had notice of Basmajian's possession of these items as early as 1943–1946 when Ben Mosley and John Bond authorized him to take them home. It had notice when Smith became archivist in June, 1970. Smith's father must have told him that Basmajian's possessed some Disney artwork, else the letter cannot be explained. The fact that he might not have understood from what his father told him the extent of the collection is beside the point. If this material is so highly valued by Disney, there was an obligation to seek more information about exactly what Basmajian did have. *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir.1964); *I–291 Why? Association v. Burns*, 372 F.Supp. 223, 239 (D.Conn.1974), *aff'd*, 517 F.2d 1077 (2d Cir.1975). This was still a further opportunity to learn the extent of Basmajian's holdings as a follow up to Basmajian, Jr.'s visit to Smith in June, 1983 about the origin of some 20 pieces of materials Basmajian brought with him. Accordingly, the claim may be subject to defense of laches.

The record establishes lawful possession by Basmajian and notice to Disney. The first sale doctrine, 17 U.S.C. § 109(a), states that where the copyright owner sells or transfer a particular copy of his copyrighted work, he divests himself of the exclusive right in that copy and the right to sell passes to the transferee. To trigger the first sale doctrine, the copyright owner must "part [ ] with title to [the] particular copy." *United States v. Atherton*, 561 F.2d 747, 750 (9th Cir.1977) *quoting United v. Wise*, 550 F.2d 1180, 1187 (9th Cir.) *cert.*

*denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). "In each case the court must analyze the arrangement at issue and decide whether it should be considered a first sale." *United States v. Bily*, 406 F.Supp. 726, 731 (E.D.Pa.1975). Title may be transferred by gift. M. Nimmer, The Law of Copyright § 8.12[B] (1984 ed.). Here the defendant Basmajian has established that the collection now in his possession was a gift from Disney. His claim that he was given this material by persons at Disney authorized in 1943–46 to give him the material has not been rebutted by any credible evidence produced by plaintiff. As lawful possessor of this material Basmajian has the right to consign it to Christie's for auction.[3]

Finally, Christie's has a far greater claim to redress on the equity side of the court than does Disney. Christie's proceeded in justifiable reliance on Basmajian's story of acquiring possession. It had conversations with Disney in which Christie's discussed frankly the origin of the Basmajian collection and the plan to dispose of the collection through auction. It has expended funds and effort in promoting Saturday's auction. Disney had the opportunity to move as early as August or September to seek the relief it now seeks a few days before the scheduled event. *See, e.g., Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 655 (2d Cir.1978) (equitable relief under the Copyright Act will not be granted where the plaintiff did not assert its rights diligently and the defendant was prejudiced by plaintiff's lack of diligence). Injunctive relief is inappropriate in any event because all Disney seeks is money.

IT IS SO ORDERED.

---

3. Basmajian's lawful possession and the lack of irreparable injury also defeat Disney's claim for a preliminary injunction based on state law, *supra* n. 1.