John BASMAJIAN, Edna Lee Basmajian and John Orin Basmajian, Plaintiffs,

v.

CHRISTIE, MANSON & WOODS INTERNATIONAL, INC., Defendant.

No. 85 Civ. 4027 (RLC).

United States District Court, S.D. New York.

Feb. 25, 1986.

Gold, Farrell & Marks, New York City, for plaintiffs; Martin R. Gold, Carl H. Tessler, of counsel.

Simpson Thacher & Bartlett, New York City, for defendant; Conrad K. Harper, Irene S. Alpert, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff John Basmajian, his wife Edna Lee Basmajian and son John Orin Basmajian have moved for judgment on the pleadings in their suit against Christie, Manson and Woods International, Inc. ("Christie's") for breach of contract, breach of fiduciary duty and conversion. In response, Christie's has cross-moved to dismiss the complaint.

### FACTUAL BACKGROUND

John Basmajian spent three years from 1943 to 1946 working as an animator for Walt Disney Productions ("Disney"). Under circumstances more fully detailed in this court's opinion in *Walt Disney Productions v. Basmajian*, 600 F.Supp. 439 (S.D.N.Y.1984) (Carter, J.), Disney allowed

him to amass a collection of Disney celluloids, sketches and drawings that would otherwise have been sent to its trash heap. Over the years, John and Edna Basmajian matted and framed these increasingly valuable artworks and hung them throughout their home. Their son inventoried the family collection.

On February 29, 1984, the Basmajians signed a contract with Christie's that consigned a number of their artworks to Christie's for sale at auction. The contract was prepared by Christie's and set forth provisions concerning commissions, sellers' warranties, and payment of various expenses, *inter alia.* Two provisions of that contract are relevant to this dispute:

11. SETTLEMENT OF ACCOUNT: Provided that Christie's has received and collected payment in full from the buyer, Christie's will pay Seller the net proceeds received and collected from the sale of the property thirty-five calendar days after the sale, after deducting its commission, any expenses incurred for Seller's account and any other amounts due it, unless Christie's shall have received notice of the buyer's intention to rescind the sale or of any other claim or shall for any reason have refunded such proceeds to the buyer prior to the expiration of such thirty-five days.

12. HOLD HARMLESS: Christie's as Seller's agent is authorized to accept the return and rescind the sale of any property at any time if Christie's, in its best judgment, determines that the offering for sale of any Property has subjected or may subject Christie's and/or Seller to any liability, including any liability under warranty of authenticity. In such event Christie's is further authorized to refund or credit to the buyer the purchase price of such returned Property and if Christie's has already remitted to Seller any proceeds of the rescinded sale, Seller agrees to pay Christie's on request an amount equal to the remitted proceeds. Seller further agrees to indemnify

Christie's and hold it harmless from and against any and all claims, loss, liabilities and expenses (including reasonable attorney's fees) relating to the claims of buyers or persons claiming for buyers resulting from Christie's offering for sale or selling any Property consigned hereunder, whether or not it has been returned to Christie's.

On December 3, 1984, five days before the scheduled December 8 auction, Disney brought an action against John Basmajian and Christie's.[1] Disney sought to enjoin the auction, claiming that John Basmajian did not lawfully possess the artworks and that any sale would infringe its copyright, 17 U.S.C. § 106. A hearing was held on December 6 and 7, 1984, at which Basmajian was represented by the law firm of Gold, Farrell & Marks and Christie's by Simpson, Thacher & Bartlett. The defendants prevailed. In an opinion with which familiarity is assumed, the court held that "Basmajian has established a prima facie case of lawful possession" of the artwork. *Disney,* 600 F.Supp. at 441. The court further held that "[i]njunctive relief is inappropriate in any event because all Disney seeks is money." *Id.* at 442. Disney later voluntarily dismissed the lawsuit.

The auction was held as planned on December 8, 1984. The Basmajians' lots were sold for $496,110, or nearly twice the price that Christie's had estimated. Christie's paid the Basmajians $432,110.66, the total hammer price less commissions of $27,-766.60, insurance premiums of $5,012.30, and legal fees of $34,220.44. These legal fees were incurred wholly in connection with the *Disney* claim. The Basmajians challenge the retention of these fees, claiming that Christie's action violates its contractual and fiduciary duties and constitutes an unlawful conversion. They seek both compensatory and punitive damages.

## DISCUSSION

■ Neither party contends that the contract is at all ambiguous. The sole ques-

---

1. There is some dispute as to when the Basmajians and Christie's became aware of Disney's eleventh-hour claim. Although such knowledge would be germane to an action for breach of the Basmajians' warranty of clear title, it is astoundingly irrelevant here.

tion before the court is whether the contract permits Christie's to deduct its legal fees under these unusual factual circumstances. That is purely a question of law, and as such, is susceptible to resolution on summary judgment, *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957) ("where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary") or judgment on the pleadings.

■ Paragraph twelve of the contract explicitly allows Christie's to deduct particular legal fees from the auction proceeds. In that paragraph, the Basmajians agreed to indemnify Christie's for any "claims, loss, liabilities and expenses (including reasonable attorney's fees) relating to the claims of buyers or persons claiming for buyers...." Disney, of course, was neither a buyer nor a person claiming for a buyer. Thus, there is no express agreement to indemnify Christie's for the expenses involved in defending against the *Disney* suit. Even if one could plausibly read this clause to cover actions by third-party claimants such as Disney, such creative interpretation would be unwarranted here because Christie's drafted the contract. *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 371 N.Y. S.2d 915, 333 N.E.2d 184 (1975).

The Basmajians ask us to interpret paragraph twelve to mean that the *only* legal fees for which Christie's can be reimbursed are those connected with buyers' claims. Although this clause does not mandate indemnification, neither does it preclude it. Nothing in the language of paragraph twelve marks it as the exclusive source of reimbursement for attorney's—or indeed any—fees.

■ Paragraph eleven provides the other possible contractual justification for Christie's action. That very broad provision permits Christie's to deduct "any expenses incurred for Seller's account and any other amounts due it...." We examine each of these clauses in turn. The first does not support Christie's action because the attorney's fees plainly were not incurred on the Basmajians' account. The contract allows Christie's to deduct certain payments—such as insurance costs—that are undeniably "on Seller's account." While we reject plaintiffs' argument that the only payments made "on Seller's account" are those that Christie's is expressly authorized to make under the contract, at the very least we think that payments "on Seller's account" must be payments made on the seller's behalf. These payments were not because the Basmajians retained their own counsel. Christie's did not retain independent counsel on the Basmajians' behalf, but on its own. Under these circumstances, it defies both common sense and the plain meaning of the phrase to say that the legal fees were incurred on the Basmajians' account. Christie's relationship with the Basmajians undoubtedly *caused* it to incur these legal fees. Nonetheless, that causal nexus does not transform Christie's expenses into ones incurred on the Basmajians' behalf.

■ The final remaining source of contractual authority for Christie's action is the clause that allows it to deduct "any expenses due it." In effect, this phrase incorporates the common law of agency into the contract. It permits Christie's to deduct expenditures for which it could be indemnified under the common law.[2] Thus, we must turn to the common law of agency, as expounded by the courts of New York,[3] in order to determine whether the contract justified Christie's action.

Where an agent defends a suit arising out of business properly conducted on the

2. The Basmajians do not seriously contend that the agreement between themselves and Christie's established anything but an agency relationship.

3. As a federal district court sitting in diversity, we are obligated to apply the law of the state in which we sit, New York. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938).

principal's behalf, it is black-letter law that the agent is entitled to indemnification of its legal fees.[4] *Herrman v. Leland,* 84 Misc. 82, 145 N.Y.S. 972 (App.Term 1914). Reciting this rule, however, does not determine this case. The rule contemplates an agent who provides the sole defense to a tort or contract suit challenging some act performed pursuant to the agency. *See* Restatement (2d) of Agency § 439, comment h. The instant case can be distinguished from this classic example in two ways: first, by the fact that John Basmajian was also named as a party and provided competent legal representation; and second, by the fact that the suit did not seek to remedy damages arising out of the past performance of the agency, but sought to enjoin the very execution of that agency. That second factor renders this case, as far as we can discern, one of first impression. Both distinctions, but particularly the latter, warrant deviation from the black-letter rule.

Our research unearths only two cases addressing the issue of reimbursement for legal fees expended by an agent where the principal, also named as a defendant, provided its own representation.[5] In the first, *Adams v. North Range Iron Co.,* 191 Minn. 55, 253 N.W. 3 (1934), the agent was the managing officer of the principal, a mining corporation. Both were named as defendants in a suit for fraud in the inducement of a contract brought by a sublessor of a mining lease. The corporation provided the defense, but after a jury verdict against them, the agent hired his own lawyer for the appeal. The corporation also provided competent appellate counsel, and the original jury verdict was reversed. The managing officer then sued the corporation for his appellate counsel fees. The Minnesota Supreme Court rejected the claim, noting that since the underlying claim was based wholly on the managing officer's purported misrepresentations, the corporation's defense necessarily protected its managing officer's interests.

In the second case, *Admiral Oriental Lines v. United States,* 86 F.2d 201 (2d Cir.1936), two shipping companies, Admiral and Atlantic, were sued for a cargo lost when the ship they operated sank during a typhoon. Admiral was Atlantic's agent, and Atlantic was the agent of the ship's owner, the United States. The two companies, each represented by its own counsel, prevailed, and Admiral then sued Atlantic for its expenses in defending the suit. Atlantic, in turn, impleaded the United States and sought both its expenses in defending the suit and those that it might be compelled to pay to Admiral. The Second Circuit rejected Atlantic's argument that "the Admiral Oriental Line should have given it notice to defend the suit on its own behalf" because Atlantic "was itself a party to the suit, and the Admiral Oriental Line had a separate interest of its own to defend; certainly until [Atlantic] volunteered to protect that interest, it was justified in protecting it itself." *Id.* at 202–03.

 Together, these cases stand for the proposition that where the principal defends itself, the agent is not eligible for indemnification unless the principal's de-

---

**4.** Section 439 of the Restatement (2d) of Agency (1958) states that:

Unless otherwise agreed, a principal is subject to a duty to exonerate an agent who is not barred by the illegality of his conduct to indemnify him for:

\* \* \* \* \* \*

(d) expenses of defending actions by third person brought because of the agent's authorized conduct, such actions being unfounded but not brought in bad faith \* \* \* \*

At § 322 of 3 C.J.S. Agency (1975), the rule is stated:

The agent is entitled to be reimbursed for the necessary cost of litigation, including attorney's fees, brought against him by third persons because of his acts done in furtherance of agency business, but he is not entitled to such costs incurred in an action brought against him by the principal for his failure properly to perform his duties.

**5.** In the only other instance of dual representation uncovered, *Buckley v. City of New York,* 264 A.D. 116, 34 N.Y.S.2d 577 (1st Dept.), *aff'd* 289 N.Y. 742 (1942), 46 N.E.2d 352, the court refused to indemnify a former city employee for his individual counsel fees, apparently because it felt that he had been named a defendant in his individual capacity, not as the city's agent.

fense leaves the agent's interests unprotected. On these facts, the Basmajians' defense did protect Christie's. By proving that they owned the artworks they made it less likely that Disney would be able to show that it would prevail on the merits, one of the prerequisites to injunctive relief. *Jackson Dairy Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). Their interest could hardly be less than Christie's; they had to protect the title, not only of the artworks that they had consigned, but also of those that they had retained. Their defense of their title necessarily protected Christie's ability to proceed with the auction.

One may object that the Basmajians' interest was not identical to Christie's because the Basmajians wanted to protect their title, but Christie's wanted to proceed with a scheduled auction. This objection merely highlights the second distinction between this case and the situation in which the black-letter rule originated; the *Disney* suit was not a *post hoc* damages action, but an *ex ante* equity action. The distinction makes a difference because it alters the relationship between principal and agent at the time the legal fees are incurred. Judge Hand provided the economic rationale for the common-law rule in *Admiral Oriental Lines, supra:* "[T]he venture is the principal's ... as the profits will be his, so should the expenses. Since by hypothesis the agent's outlay is not due to his mismanagement, it should be regarded only as a loss, unexpected it is true, but inextricably interwoven with the enterprise." 86 F.2d at 202. In the paradigmatic case, at the time the third-party brings the action the agent has already committed the act complained of. Faced with the suit, it has no choice but to defend itself against liability. The cost of defending against the meritless suit is an unanticipated cost of the execution of the agency; fairness demands that such a cost lie, not with the agent on whom it fortuitously fell, but on the principal who properly bears the risk.

■ Christie's was not in such straits when the *Disney* suit was initiated. Indeed, its position appears enviable. The auction house faced no liability. Christie's could have chosen to withdraw from the auction, sue the Basmajians, and recover its expenses. Instead, it chose to contest the action and hired a high-powered Wall Street firm to do so. The fact that it elected this course rather than withdrawal does not lead to the inference that Christie's was benevolently protecting the Basmajians. Rather, we infer that Christie's bet that the Basmajians would be able to prove their title good. This bet was uniquely risk-free. If Christie's was wrong and the Basmajians did not own the Disney collection, it could presumably recover its out-of-pocket expenses from the Basmajians, who would have breached their warranty of clear title.[6] Christie's, unlike the agent sued in an action at law, enjoyed desirable options; its losses were guaranteed by the Basmajians, and it could still hope to become the premier auction house for Disney artworks. In this secure position, the fact that Christie's chose to enhance its odds of success by hiring its own counsel is not fairly chargeable to the Basmajians. The Basmajians solely bore the risk of the Disney litigation, and they shouldered that risk when they hired their own counsel.

Plaintiffs' motion for judgment on the pleadings is granted. Christie's violated its contract with the Basmajians when it withheld its legal fees. It is not entitled to those fees under the principles of agency. Because plaintiffs have made out their contractual claim, we do not address their

---

6. Indeed, Christie's insists that the Basmajians breached their contract once the *Disney* suit was filed. This attempt to color the facts is at best irrelevant; at worst, it undermines Christie's position. Any breach presumably was cured by this court's ruling that the Basmajians established a prima facie case of lawful possession.

Moreover, if Christie's had truly believed the Basmajians to be in breach of their contract at the time of the *Disney* suit, it had a duty not to proceed with the auction, as well as a duty not to incur further costs in connection with the auction.

breach of fiduciary duty and agency arguments.

 Christie's motion to dismiss is granted as to plaintiffs' claim for punitive damages. Punitive damages are not available under New York law for breach of contract. *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976).

The Basmajians are awarded $34,220.44, the amount withheld by Christie's, plus interest and costs.

IT IS SO ORDERED.