MEADOWBROOK–RICHMAN,
INC., Plaintiff,

v.

ASSOCIATED FINANCIAL CORP.,
Wilshire Investment Corp., United
Housing Preservation Corporation,
Westport Housing Corporation, A.
Bruce Rozet and Deane Earl Ross,
Defendants/Third–Party Plaintiffs

v.

Benjamin RICHMAN and Polar
International Brokerage Corp.
Third Party Defendants

No. 98 CIV. 5300(JGK).

United States District Court,
S.D. New York.

March 27, 2003.

---

## OPINION AND ORDER

KOELTL, District Judge.

This is a breach of contract action arising under New York law brought by the plaintiff Meadowbrook–Richman, Inc. ("MRI") against various entities including Associated Financial Corp. ("AFC"), Wilshire Investment Corp. ("Wilshire"), United Housing Preservation Corporation ("United Housing"), Westport Housing Corporation ("Westport Housing"), and against two individual defendants, A. Bruce Rozet ("Rozet") and Deane Earl Ross ("Ross"), (collectively "the defendants") to recover damages for the failure to pay for various insurance related services provided by MRI. Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a)(1). MRI's allegations arise out of the defendants' failure to pay for services provided pursuant to a retainer agreement (the "1995–96 Retainer Agreement") for the year 1995–96 and a second agreement dated July 21, 1991 (the "Claims Adjustment Agreement").

The plaintiff alleges five causes of action in its Second Amended Complaint: (1) a claim for breach of contract based on the 1995–96 Retainer Agreement (Count 1);

(2) a claim for breach of contract arising out the Claims Adjustment Agreement (Count 2); (3) a claim for indemnification for the legal fees incurred by MRI in defending against lawsuits resulting from the services MRI provided pursuant to the Claims Adjustment Agreement (Count 3); (4) a claim for account stated (Count 4); and (5) a claim for quantum meruit (Count 5). The defendants have now moved for summary judgment arguing, among other things, that the two contracts are unenforceable because they do not appropriately designate the parties to be charged under the contracts, and do not provide any specifics with respect to the compensation that is to be provided to the plaintiff. In addition, they allege that the contracts are unenforceable because of the criminal conduct of the plaintiff in connection with the provision of the insurance adjustment services at issue in this case. The two individual defendants, Rozet and Ross, have moved for summary judgment on the basis of personal jurisdiction, arguing that they have insufficient contacts with New York.[1]

The defendants, AFC, Wilshire, United Housing, Westport Housing, Rozet, and Ross (alternatively "third-party plaintiffs"), brought a third-party complaint against Benjamin Richman ("Richman") and Polar International Brokerage Corporation ("Polar") for damages arising out of services provided by Richman, who is now president of MRI and former chairman of Polar, and Polar. The third party complaint alleges fifteen causes of action: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b), by MRI; (2) violations of

---

1. In their papers, the defendants argued that the plaintiff's claims could be dismissed either on the basis of New York or California law. At oral argument, the defendants explained that relevant legal principles for this case did not differ between California and New York.

Due to the absence of any conflict, the defendants agreed that the case could be decided simply by reference to New York law. Thus, the motions to dismiss are being decided on the basis of New York law.

RICO, 18 U.S.C. § 1962(c), by MRI; (3) violations of RICO, 18 U.S.C. § 1962(a), by MRI; (4) violations of RICO, 18 U.S.C. § 1962(c) by Richman; (5) RICO violations by Richman and MRI in violation of 18 U.S.C. §§ 1962(a), (b), (d); (6) unfair trade practices by MRI, Richman, and Polar; (7) conversion or theft of insurance claim funds; (8) fraud, misrepresentation, and deceit; (9) breach of contract; (10) negligence and professional malpractice; (11) breach of fiduciary duty; (12) misrepresentation;[2] (13) spoilation and tampering with evidence; (14) indemnity and contribution; (15) negligence.[3] Polar has moved for summary judgment on all of the claims raised by the third-party plaintiffs, arguing, among other things, that Polar cannot be held liable for damages for services provided by Richman, because when those services were being provided by Richman, he was acting on behalf of MRI, not Polar, and any services provided were part of a fraudulent and illegal kickback scheme engaged in between the third-party plaintiffs and Richman, and were not legitimate insurance-related services. In addition, Polar argues that it cannot be held liable for actions of Richman, because any actions taken by Richman were adverse to Polar's interest. For purposes of convenience, the disposition of Polar's motion for summary judgment with respect to the claims by the third-party plaintiffs is discussed after the defendants' motion for summary judgment which seeks dismissal of MRI's complaint.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Ra-*

---

**2.** Although the third party complaint indicates that there are sixteen causes of action, the third-party plaintiffs do not allege a thirteenth cause of action.

**3.** Although the third-party plaintiffs indicate that they have also made counterclaims against the original plaintiff, MRI, the third-party complaint does not list the claims against MRI as counterclaims, but includes them with the causes of action against Polar and Richman. For the purposes of convenience, the claims by the third-party plaintiffs against MRI, Richman, and Polar are all referred to as claims arising out of the third-party complaint.

*dio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir. 1998) (collecting cases).

## II.

Unless otherwise noted, there is no dispute as to the following facts.

Benjamin S. Richman ("Richman") is the president of MRI. (Aff. of Benjamin S. Richman ("Richman Aff.") sworn to March 13, 2002 at ¶ 1; Dep. of Benjamin Richman dated June 28, 2001 ("Richman Dep.") attached as Exh. 2 to Decl. of Mitchell Rotbert ("Rotbert Decl.") dated April 3, 2002 at 44.) Richman also served as the sole shareholder and director of MRI. (Defs.' Rule 56.1 Stmt. ¶ 2; Richman Dep. attached as Exh. 2 to Rotbert Decl. at 44.) Prior to his affiliation with MRI, Richman was the Chairman of the Board of Polar International Brokerage Corp. ("Polar"). (Richman Aff ¶ 1.) MRI was a licensed insurance broker in New York. (Defs.' Rule 56.1 Stmt. ¶ 3.) Polar and MRI, through a April 28, 1989 agreement, commenced a joint venture through which the two companies agreed to share profits and

losses associated with the administration of insurance programs, including programs of partial self-insurance for the insureds that were successfully solicited by either of them. (Defs.' Rule 56.1 Stmt. ¶ 8; Letter dated April 28, 1989 attached as Exh. 8 to Rotbert Decl.)

AFC, along with Wilshire, Wesport Housing, and United Housing were entities under the control of Ross and Rozet. (Richman Aff. ¶ 11.) AFC, Wilshire, Wesport Housing, United Housing, and Ross and Rozet, controlled hundreds of partnership properties that were established under the auspices of the United States Department of Housing and Urban Development ("HUD"). (Richman Aff. ¶¶ 10–11.) Ross and Rozet entered into an agreement in approximately June 1990 with Lawrence Penn ("Penn") of PL Acquisition, Inc. ("PLA") whereby Penn and PLA were given the right to create and administer the insurance programs for these various HUD partnership properties, which had a combined insured value in excess of $ 1 Billion. (*Id.;* Dep. of Stanley Kleckner dated July 27, 2001 attached as Exh. 9 to Rotbert Decl. at 37.) Thus, PLA became designated agent for AFC and the other defendants. (Defs.' Rule 56.1 Stmt. ¶ 14; Richman Aff. ¶ 2.)

Thereafter, PLA and Richman entered into an agreement whereby Richman was asked to arrange an insurance program to insure the AFC properties. (*Id.*) Pursuant to a March 5, 1991 Agreement (the "Retainer Agreement") entered into by Richman and PLA, Richman agreed to retain Polar to provide the insurance for the AFC properties and to retain MRI to provide the claims services that would arise from the existence of that coverage. (Richman Aff. ¶ 3; Letter dated March 5, 1991 attached as Exh. A to Richman Aff.) Pursuant to the Retainer Agreement, Richman was to be paid a retainer from which com-

missions earned by Richman or Polar for providing adjustment services or negotiating insurance contracts would be paid. (Richman Aff. ¶¶ 21, 24.) Should the actual commissions earned exceed the retainer amount, the excess commissions would be credited against the subsequent year's retainer amount. (Richman Aff. ¶ 24.) Should, however, the actual commissions be less than retainer amount, AFC would still be liable to Richman for the difference. (Id.; Richman Dep. attached as Exh. 13 to Rotbert Decl. at 54.)

This retainer agreement was extended and adjusted every year to account for the costs and fees associated with a particular policy period. (Richman Aff. ¶¶ 3, 23.) There were agreements drafted for the 1992–93, 1993–94, 1994–95, and 1995–96 policy years. MRI's claim in Count 1 of the Complaint arises out the alleged failure of AFC to pay amounts remaining due pursuant to the 1995–96 extension of the Retainer Agreement. (Am. Compl. ¶¶ 28–29; Letter dated June 25, 1995 ("1995–96 Retainer Agreement") attached as Exh. B. to Richman Aff.) The June 1995 Retainer Agreement covered the 1995 to 1996 policy year and the retainer to be paid to MRI and Polar was $500,000. (Id.; Richman Aff. ¶ 26; Richman Dep. attached as Exh. 13A to Rotbert Decl. at 53.)

During the 1995–96 policy year, the relationship between Polar and MRI ended. (Richman Aff. ¶ 25; Letter dated October 10, 1995 attached as Exh. 10 to Rotbert Decl.) Polar received $217,000 in brokerage commissions for the year 1995–96, although it had not executed the 1995–96 extension of the original Retainer Agreement. (Richman Aff. ¶ 26; Am. Compl. ¶ 18; Richman Dep. attached as Exh. 13A to Rotbert Decl. at 52–53.) AFC subsequently asked Richman and MRI to fulfill the obligations previously undertaken by Polar, and pursuant to an oral agreement, MRI agreed to do so, in return for being paid the remaining amount due under the 1995–96 Retainer Agreement. (Richman Aff. ¶¶ 26, 27; Richman Dep. attached as Exh. 13A to Rotbert Decl. at 55–56.) MRI alleges in Count 1 of the Complaint that pursuant to the 1995–96 Retainer Agreement, AFC owes MRI $283,000, which is the difference between the $500,000 retainer amount and the $217,000 in commissions actually earned and paid to Polar. (Id.; Am. Compl. ¶ 18.)

MRI and PLA also negotiated an agreement in July 1991 (the "Claims Adjustment Agreement") whereby MRI agreed to provide a variety of insurance services for the AFC-owned HUD partnerships relating to the handling of their insurance claims. (Richman Aff. ¶ 31; Letter dated July 21, 1991 ("Claims Adjustment Agreement") attached as Exh. C to Richman Aff.) The services to be performed by MRI included reporting claims to relevant claims adjustors, maintaining files and reporting progress on claims to PLA, negotiating claims settlements, and performing various other roles that included, but were not limited to, those performed by a traditional "public claims adjuster." (Richman Aff. ¶¶ 34, 36.) In Count 2 of its Complaint, MRI seeks to recover $ 851,381.50 arising out of services provided pursuant to the Claims Adjustment Agreement. (Compl. ¶¶ 20, 22.) This amount includes work on insurance claims filed for property owned by AFC that was damaged by Hurricane Andrew. (Richman Aff. ¶ 54.)

The plaintiff, the defendants and PLA were involved in illegal contractor kickback schemes that involved, among other things, the filing of excessive damage claims. (See Plea Agreement of Benjamin Richman attached as Exh. 21 to Rotbert Decl; Plea Agreement of Management Assistance Group attached as Exh. 10 to Decl. of Charles Stewart dated May 13, 2002 ("Stewart Decl."); Plea Agreement of

PLA attached as Exh. 11 to Stewart Decl.) Richman alleges that he became aware, after entering into the agreement with PLA, that Ross, Rozet, Penn and PLA were generating excessive charges on the portfolio of HUD properties that AFC owned. (Richman Aff. ¶ 60.) After Hurricane Andrew damaged four properties owned by AFC, and controlled by Ross and Rozet, Penn and Richman created the National Development and Consulting Corporation to negotiate the amounts due under their insurance policies. (Richman Aff. ¶¶ 61–62.) Through this corporation, Richman and MRI engaged in a contractor kick-back scheme to charge excessive fees for the Hurricane Andrew damaged properties that were owned by AFC. (Richman Aff. ¶ 69.) Richman alleges that a portion of these illegal proceeds went to Ross, Rozet and Penn. (Richman Aff. ¶¶ 63–64, 67.) Richman pleaded guilty to criminal activity regarding the Hurricane Andrew claims. (Richman Aff. ¶ 69.) The Government also charged the defendants with illegal conduct in connection with this and other schemes, and for improperly taking kickbacks and inflating costs for repair of properties damaged by Hurricane Andrew. (Richman Aff. ¶ 69.) Richman alleges that the defendants, along with Penn, were found guilty of committing civil or criminal violations and ultimately agreed to pay over $10 million in penalties and fines for their unlawful conduct. (Richman Aff. ¶ 71.)

### III.

The defendants first seek summary judgment on the plaintiff's claims for breach of contract of the 1995–96 Retainer Agreement and of the Claims Adjustment Agreement. The defendants argue that these contracts do not satisfy New York Ins. Law § 2119(c)(1) because they are not in writing, because they do not specify the party to be charged, and because they do not specify the compensation due to the plaintiff. None of these arguments has merit.

Section 2119(c)(1) provides:

No insurance broker may receive any compensation, other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the negotiation or procurement of, or other services in connection with, any contract of insurance made or negotiated in this state or for any other services on account of such insurance policies or contracts, including adjustment of claims arising therefrom, unless such compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation.

With respect to the 1995–96 Retainer Agreement, the defendants first argue that AFC and PLA only became liable for the remaining balance due under the 1995–96 Retainer Agreement pursuant to an oral modification of the 1995–96 Retainer Agreement, and contend that such oral contracts are unenforceable because § 2119(c)(1) requires that such contracts be in writing. This argument is unavailing because the plaintiff is not seeking to enforce the oral modification of the 1995–96 Retainer Agreement, but the actual written extension of the Retainer Agreement as embodied in the letter dated June 26, 1995. (Am. Compl. ¶¶ 16–17, 25–29; 1995–96 Retainer Agreement at 1–3.) The "written memorandum" provision of § 2119(c)(1) is clearly satisfied because there is no oral agreement at issue.

The defendants also argue that the 1995–96 Retainer Agreement and the Claims Adjustment Agreement are not enforceable because both contracts are signed by the agent of the defendants, PLA, and not by any of the defendants themselves. The defendants argue that

New York Ins. Law § 2119(c)(1) prohibits the enforcement of insurance contracts against a defendant where the contract has only been signed by an agent of the defendant and not by the defendant. In this case, both the original retainer agreement dated March 5, 1991 and the extension for the 1995–96 year, as well as the Claims Adjustment Agreement, were signed by Laurence Penn as President of PL Acquisition, Inc. There is ample evidence that PLA was the agent for the disclosed principal, AFC and its affiliates. The original retainer agreement authorized Richman, as President of MRI, "to establish claims accounts for the benefit of partnerships in which Associated Financial Corp., or its affiliates are general partners." (Retainer Agreement at 2.) The 1995–96 Retainer Agreement which extended the original Retainer Agreement provided that "Benjamin S. Richman and/or Polar International Brokerage are entitled to an aggregate Retainer fee of $500,000 to provide services to our client, Associated Financial Corporation, et al." (1995–96 Retainer Agreement at 2.) The Claims Adjustment Agreement provided explicitly that Mr. Richman's organization "is prepared to provide to my client Associated Financial ("AFC"), its subsidiaries and affiliates [services] . . ." (Claims Adjustment Agreement at 1.)

The defendants offer no authority to support their restricted interpretation of § 2119(c)(1). The plain text of the statute does not prohibit an agent from signing the agreement for its principal. In addition, the defendants can point to no case where § 2119(c)(1)'s requirement that an insurance contract be "signed by the party to be charged" has been interpreted so narrowly so as to prohibit a principal from being held liable for contracts entered into by its duly-authorized agent.

█ Finding that the principal is bound by an insurance contract signed by its duly authorized agent is consistent with the purpose of § 2119(c)(1). The purpose of § 2119(c)(1) is to protect insureds from unscrupulous insurance brokers who would charge insureds and receive additional compensation without their knowledge. *Srein v. Soft Drink Workers Union, Local 812,* 93 F.3d 1088, 1094 (2d Cir.1996); *Aeropulse v. Armstrong & Brooks, Ltd.,* 740 F.Supp. 938, 948 (E.D.N.Y.1990); *Gibbons v. Dewitt Stern Group, Inc.,* 289 A.D.2d 196, 733 N.Y.S.2d 692, 694 (App.Div.2001). It cannot be said that holding principals responsible for the written contracts entered into by their agents is inconsistent with the statutory purpose of protecting unsuspecting insureds. The defendants entered into a voluntary agreement with PLA, and clearly and unequivocally authorized PLA to serve as AFC's agent for the purposes of obtaining insurance for the HUD partnership properties. That agreement contemplated that PLA would enter into insurance contracts, with brokers and others, on behalf of AFC. The defendants were on notice of the fact of PLA's existence and voluntarily chose to have PLA act on their behalf. Holding the defendants responsible for contracts entered into by PLA under these circumstances would not contravene § 2119(c)(1). Indeed, to allow the defendants to escape their obligations under the written agreement would not further the statutory purpose.

Thus, there is no basis in fact or law to conclude that either the 1995–96 Retainer Agreement or the Claims Adjustment Agreement is unenforceable because those contracts are signed by the agents of the defendants rather than by the defendants themselves.

█ In a passing footnote and without any citation to any case authority, the defendants also argue that MRI is not entitled to any monies under either the 1995–

96 Retainer Agreement or the Claims Adjustment Agreement, because both agreements were signed by Richman, and not MRI, and allowing MRI to enforce the contract would violate the purpose of § 2119(c)(1). This argument also has no merit. There is no dispute that at all relevant times Richman was the president of MRI, and that when the agreements were signed, he was acting in his official capacity as president of MRI. In fact, the 1995–96 Retainer Agreement states in the signature line "Agreed and Accepted" and is followed by "Meadowbrook–Richman, Inc" which in turn is followed by the signature of Richman. (1995–96 Retainer Agreement at 3.) In addition, the 1995–96 Retainer Agreement clearly contemplates that services are to be performed by MRI and allowing MRI to enforce the agreement would not be inconsistent with the agreement. (*See id.* at 2.) With respect to the Claims Adjustment Agreement, the agreement clearly refers to Richman's "organization" and his "affiliates" and thus contemplates Richman's involvement with the entities, such as MRI, that he controls. (Claims Adjustment Agreement at 1.)

■ To the extent that the agreements only permit Richman to enforce the contract, the plaintiff has argued that Richman assigned his rights under those contracts to MRI, but the defendants contend that such an assignment was either not made or is not permitted under New York law. (Richman Dep. attached as Exh. 14 to Rotbert Decl. at 65.) Assignments of contractual rights like those at issue in this case are not prohibited as a matter of law. *See Am. Banana Co., Inc. v. Venezolana Internacional De Aviacion S.A. (VIASA),* 67 A.D.2d 613, 411 N.Y.S.2d 889, 890 (1979) (noting that some assignments of contracts may be made for the purposes of suit, absent consideration, and orally), *aff'd,* 49 N.Y.2d 848, 427 N.Y.S.2d 789, 404 N.E.2d 1330 (1980). To the extent that the nature of the assignment is in dispute,

the nature of the assignment would not be a basis for summary judgment, because under certain circumstances Richman may be permitted to transfer his rights to MRI, and it cannot be said, as a matter of law, that Richman's purported assignment was invalid.

■ The defendants' final contention based on § 2119(c)(1) is that summary judgment is appropriate because neither the 1995–96 Retainer Agreement nor the Claims Adjustment Agreement specifies the amount of compensation that is due to be paid to MRI. Section 2119(c)(1) provides that an insurance contract must "specif[y] or clearly defin[e] the amount or extent" of the compensation due under such an insurance contract. N.Y. Ins. Law. § 2119(c)(1). It cannot be said that as a matter of law that neither agreement satisfies that requirement. The 1995–96 Retainer Agreement indicates that it is an "extension and modification" of the 1991 Retainer Agreement, which the defendants do not dispute specifies or clearly defines the amount of compensation due to MRI. (1995–96 Retainer Agreement at 1.) In addition, the 1995–96 Retainer Agreement states in explicit terms, that "Richman ... [is] entitled to an aggregate Retainer fee of $500,000 to provide services." (*Id.* at 2.)

■ With respect to the 1991 Claims Adjustment Agreement, the defendants concoct an argument that this agreement is insufficiently specific so as to satisfy § 2119(c)(1), but provide no standards or case law by which to measure the appropriate level of specificity required by the statute. Section 2119(c)(1)'s requirement that a contract contain the terms of the compensation to be paid by the insured is a disjunctive test: the agreement must either "specify" or "clearly define" the "amount or extent" of the compensation due. By focusing their arguments on the lack of specificity, the defendants ignore

the fact that the 1991 Claims Adjustment Agreement clearly defines the compensation due. The agreement provides, in relevant part, ".You or an affiliate of yours is prepared to supply public adjuster services on behalf of AFC ... for a fee of 8% of the recovered amount plus reasonable out of pocket expenses." (Claims Adjustment Agreement at 1.) The defendants' additional argument, that this 8% figure does not satisfy the requirements of § 2119(c)(1) because HUD may ultimately reduce the fees charged, in its subsequent review of adjustment fees charged on HUD properties, is also meritless. The fact that a fee may be subject to adjustment or uncertainty does not mean that the fee does not satisfy § 2119(c)(1). The contract clearly defines the percentage rate to be charged, which is capped at 8%, and clearly defines the circumstances under which a downward adjustment of fees would occur, namely HUD review. Moreover, given that § 2119(c)(1) is intended to protect insureds from being charged hidden fees, it cannot be said that a contractual provision that could ultimately reduce the fees to be charged would violate the statute's protections against fraud.

Thus, the defendants' arguments based on New York Ins. Law § 2119(c)(1) have no merit and the motion to dismiss the plaintiff's breach of contract claims on the basis of those arguments is denied.

### IV.

■ The defendants also seek summary judgment on Count 2, arguing that under the Claims Adjustment Agreement, as a matter of law, the defendants cannot be held liable for the fees for services provided by MRI, because the Agreement requires that insurance companies with whom MRI negotiates insurance coverage to pay for those services. Summary judgment is not appropriate on this claim because there remains a genuine issue of fact as to whether the agreement can be inter-

preted to provide that the defendants, rather than the insurance companies, were responsible for paying for the plaintiff's adjustment services. The Claims Adjustment Agreement could reasonably be read to require that payments be made by PLA, given that the Agreement is between PLA and Richman. (Claims Adjustment Agreement at 1–2.) Moreover, the Agreement states that AFC agrees to have Richman perform adjustment services "in reliance" of the representations made by Richman and that are outlined in the letter. (*Id.* at 1.) Those representations include the fact that Richman would be receiving an 8% fee. (*Id.*) The fact that the defendants entered into an agreement in part based on Richman's representations regarding fees suggests that the fees were to be paid by the defendants rather than the insurance companies with whom Richman was negotiating. Because it cannot be said that the agreement is unambiguous and that the defendants had no liability for fees to the plaintiff, summary judgment cannot be granted on this claim.

### V.

■ The defendants also seek summary judgment on all of the plaintiff's claims, arguing that Richman's criminal conduct in connection with the Hurricane Andrew kickback scheme bars recovery in this case because the damages the plaintiff seeks result from services provided in connection with or in furtherance of his illegal activities. The defendants fashion their arguments as based on the doctrines of illegality, faithless servant, and breach of fiduciary duty. This argument is at best ironic in view of the charges of participation in criminal activities that Richman levels against the defendants.

Summary judgment is not appropriate based on any of these arguments. Primarily, with respect to the services provided

under the Claims Adjustment Agreement and for which the plaintiff seeks damages, Richman alleges that only one of the 38 claims for services involves adjustment services provided for Hurricane Andrew damaged properties. (Richman Aff. ¶ 54.) There is no allegation that the 1995–96 Retainer Agreement is tainted by fraud. In addition, the defendants were also substantially involved in the same or related criminal conduct, a fact that the defendants failed to acknowledge in their initial moving papers or their Rule 56.1 Statement. The plaintiff argues that any illegal conduct was not related to the one Hurricane Andrew claim, that this claim was for legitimate services provided, and that the defendants are unfairly using unrelated illegal conduct to block legitimate claims, while failing to acknowledge their own illegal behavior. Although there is some evidence to indicate that all the parties in this case were involved in fraudulent activity, there is no basis, in the record now before the Court, to unravel the complex threads of illegal conduct and determine whether the plaintiff's conduct is tainted or pure with respect to the specific claims for damages in this case. Under these circumstances, there remains a genuine issue of material fact as to whether there was sufficient illegality so as to block the plaintiff's claim for services under the doctrines of illegality, faithless servant, or breach of fiduciary duty. The defendants' motion for summary judgment, based on these arguments, is therefore denied.

## VI.

■ The defendants also move for summary judgment on the plaintiff's claim for attorneys' fees, arguing that there is no provision in any contract providing for the indemnification of MRI for attorneys' fees and that such implied indemnification is barred by New York law.

■ "Where an agent defends a suit arising out of a business properly conducted on the principal's behalf, it is black-letter law that the agent is entitled to indemnification of its legal fees." *Basmajian v. Christie, Manson & Woods Int'l, Inc.,* 629 F.Supp. 995, 998–999 (S.D.N.Y. 1986). In the present case, the plaintiff served as the agent for the defendants in the procurement of insurance and asserts that as a result of serving in that capacity, MRI incurred legal fees in defending litigation that arose out of services conducted by MRI on behalf the defendants. The defendants have not come forward with any argument or evidence suggesting that the legal fees were not incurred during MRI's role as an agent, and only contend that indemnification is barred by New York law. However, the indemnification for legal fees of agents is a well established principle of agency law. *See id.; Admiral Oriental Line v. United States,* 86 F.2d 201, 202 (2d Cir.1936) (Hand, J.); *Herrman v. Leland,* 84 Misc. 82, 145 N.Y.S. 972, 974 (1914). Therefore, the defendants' motion for summary judgment on this claim must be denied.

## VII.

There is no independent basis to grant summary judgment on the plaintiff's claims for account stated and quantum meruit. Therefore, these counts cannot be dismissed.

## VIII.

■ The two individual defendants, Ross and Rozet, have also moved for summary judgment arguing that there is no basis for this Court to assert personal jurisdiction over them because they lack meaningful contacts with New York.

A court sitting in diversity applies the law of the forum state in determining whether it has personal jurisdiction over a defendant. *See CutCo Indus. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *APC*

*Commodity Corp. v. Ram Dis Ticaret A.S.,* 965 F.Supp. 461, 464 (S.D.N.Y.1997). A Court must determine, first, whether New York law permits the exercise of personal jurisdiction over the defendants; and, second if jurisdiction is proper under New York law, the Court must determine whether such exercise comports with due process. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The only arguments Ross and Rozet raise on their summary judgment motion are based on New York law, and they do not raise any due process arguments.

"It is clear that if a court has jurisdiction over a corporation, it may obtain jurisdiction over a corporate officer or shareholder by disregarding the corporate entity." *Kinetic Instruments, Inc. v. Lares,* 802 F.Supp. 976, 985 (S.D.N.Y.) (Sand, J.). To pierce the corporate veil the party seeking to pierce the veil must "make a two part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997).

The plaintiffs have consistently argued that the exercise of personal jurisdiction over the individual defendants is appropriate, because personal jurisdiction exists over the other entity defendants, including AFC, that were merely alter-egos of Ross and Rozet. The defendants argue that there is no evidence suggesting that these entities were under the dominion of Ross and Rozet, and therefore summary judgment is appropriate. However, there is evidence that Ross and Rozet controlled AFC and made ultimate and significant decisions regarding AFC. (*See, e.g.,* Dep. of Elizabeth Molavi dated June 8, 2001 attached as Exh. 9 to Stewart Decl. at 25;

Dep. of Lawrence Penn dated June 18, 2001 attached as Exh. 7 to Stewart Decl. at 21–23.) There is also evidence that the AFC and related entities were used by Ross and Rozet in a fraudulent manner and to avoid and delay payment of various contractual and loan obligations due to the plaintiff MRI. (*See, e.g.,* Richman Aff. ¶¶ 74–78; Letter dated March 27, 1996 attached as Exh. 28 to Stewart Decl.) There is a genuine issue of material fact as to whether the individual defendants did in fact control AFC and the other defendants in a sufficient manner so as to disregard the corporate form and assert personal jurisdiction over them.

MRI also argues, pursuant to the New York long arm statute, that there is personal jurisdiction over the individual defendants because AFC and the other entities were acting as agents in New York of Ross and Rozet. N.Y.C.P.L.R. § 302(a)(1) provides in relevant part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or *through an agent:* (1) transacts any business within the state or contracts anywhere to supply goods or services in the state ...

(emphasis added). A corporation may act as the agent of an individual for the purposes of § 301(a)(1). *Retail Software Services, Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir.1988). There is evidence that the activities performed by AFC in New York, including entering into various contracts, was done with the knowledge, consent, and direction of Ross and Rozet. (Richman Aff. ¶¶ 10, 11, 23, 74; Am. Compl. ¶ 13.) Thus, there also exists a genuine issue of fact as to whether the relationship between Ross and Rozet and AFC is of a kind such that AFC was acting as the

agent of Ross and Rozet when entering into the contracts at issue in this case.

Under these circumstances, the individual defendants' motion for summary judgment on the basis of lack of personal jurisdiction is denied.

## IX.

With respect to Polar's motion for summary judgment on claims by the third-party plaintiffs, the reasons why there are material facts in dispute with respect to the claims brought by MRI against the defendants/third-party plaintiffs also would preclude granting the relief Polar seeks in its summary judgment motion.

### A.

As an initial matter, it is unnecessary to lay out any additional undisputed facts with respect to the claims raised by the third-party plaintiffs because it is clear that the facts already laid out in regards to the claims raised by MRI against the defendants, in the original case, are sufficient to resolve the issues currently being raised by Polar.

### B.

█ Polar first argues that summary judgment is appropriate because the illegal conduct engaged in by Richman and the third-party plaintiffs, including AFC, bars AFC and the other parties from recovery. Polar argues that since all of the damages that the third-party plaintiffs seek are based on services provided by Richman, on behalf of Polar, to the extent that Richman was not acting within his scope of authority in providing those services, Polar cannot be held liable for such services. Polar's contention is that Richman's involvement in the illegal contractor kickback scheme constituted actions beyond the scope of the agency relationship between Polar and Richman, and consequently, since all of the damages sought by the third-party plaintiffs are for services provided in further-

ance of the fraudulent scheme, Polar cannot be held liable for any of those services.

Polar's argument would require finding that none of the damages sought by the third-party plaintiffs arise out of legitimate claims or services provided by Richman on behalf of Polar. As explained above, it is impossible based upon the record now before the Court to separate out the threads of the illegal conduct so as to determine which claims or services provided by any party in this case were not tainted by the pervasive illegal conduct engaged in by all of the parties. The affidavits and the record in the case make clear that allegations of fraud abound and that mutual finger-pointing and accusations of illegality characterize the relationship between all of the parties. There are material facts in dispute with respect to the extent of the illegal conduct engaged in by all of the parties in the case, when such illegal conduct began and ended, whether such illegal conduct did or did not affect the legitimacy of the services provided by each of the parties, and what the exact relationship between all of the parties was. Under such circumstances, summary judgment cannot be granted on the basis of an argument that contends that the illegal conduct of one set of parties with respect to a certain set of claims precludes relief.

Moreover, Polar has made no attempt to explain to which causes of actions alleged by the third-party plaintiffs the doctrine of illegality would apply. The third-party plaintiffs have alleged violations of RICO, breach of contract, misrepresentation, among other things, and Polar has made no attempt to indicate whether illegality precludes recovery on some, or all, of these causes of action. This is an independent basis on which to deny Polar's summary judgment motion.

### C.

█ Polar raises two related agency arguments, that Richman had no actual or apparent authority to bind Polar for services provided, since Richman was actually acting on behalf of MRI, and that Polar cannot be liable for the actions of Richman, because to the extent Richman was Polar's agent, Richman was acting in a manner adverse to Polar and therefore Polar cannot be held liable for those actions. Summary judgment based on these arguments is also denied.

Polar has failed to link these agency arguments to the specific causes of action alleged by the third-party plaintiffs and to indicate whether the lack of an agency relationship precludes recovery on some, or all, of the claims.

In addition, there are material facts in dispute with respect to the exact relationship between Richman and Polar and MRI so that summary judgment cannot be granted. There are facts in dispute with respect to when the relationship between Richman and Polar was terminated, whether the end of that relationship was known to the third-party plaintiffs so that the third-party plaintiffs may not sue Polar for services provided by Richman, and whether the damages sought by the third-party plaintiffs arise out of services provided by Richman when he was acting exclusively on behalf of MRI. The facts also indicate that for a period of time there was a joint venture between MRI and Polar to provide insurance services and it cannot be said that, as a matter of law, the joint venture and the interrelationship between MRI and Polar was of a kind that when Richman provided services to the third party plaintiffs, Richman was not acting as Polar's agent.

Summary judgment on the basis of these arguments is also denied.

### D.

█ In its reply papers, Polar argues that the third-party plaintiffs fail to allege causation and that this failure requires summary judgment on all of the "brokerage claims." Summary judgment cannot be granted on the basis of arguments that are first raised in reply papers, because the third-party plaintiffs have had no opportunity to respond to such arguments, and in any event, full consideration and development of these issues require that the arguments be raised in the original moving papers. *See Friends of Gateway v. Slater,* 257 F.3d 74, 78 n. 3 (2d Cir.2001); *Ernst Haas Studio, Inc. v. Palm Press, Inc.,* 164 F.3d 110, 112 (2d Cir.1999) (per curiam). Summary judgment on the basis of an alleged lack of causation is denied.

### E.

█ Polar has also raised an argument that the third-party plaintiffs may not recover damages because they failed appropriately to amend their responses to certain. As the third-party plaintiffs correctly point out, this argument is not a basis on which to grant summary judgment, and it is appropriately either a discovery dispute or a motion for sanctions based on the failure to provide complete and accurate responses to interrogatories. In addition, before any such discovery motion may be made, Polar must request a discovery conference. *See* Local Rule 37.2. The failure to request such a conference requires that any motion based on the alleged failure to provide interrogatory answers be denied.

### CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, the defendant's motion for summary judgment on the plaintiff's claims is denied. The motion by

the individual defendants for summary judgment on the basis of a lack of personal jurisdiction is also denied. Finally, the motion for summary judgment by Polar with respect to the claims alleged by the third-party plaintiffs is also denied.

The parties should submit joint pre-trial orders by **April 15, 2003.**

SO ORDERED.